404 F.2d 1001
 CHESAPEAKE BAY BRIDGE AND TUNNEL DISTRICT, Respondent, Appellant,
v.
J. LAURITZEN, owner M/S BELLA DAN, Libellant; Tidewater Construction Corporation, Raymond International, Inc. and Peter Kiewit Sons' Company, a joint venture, trading as Tidewater-Raymond-Kiewit, and Merritt-Chapman and Scott Corporation, Respondents, Appellees.
 No. 11886.
 United States Court of Appeals Fourth Circuit.
 Argued March 5, 1968.
 Decided May 2, 1968.
 
 R. M. Hughes, III, and Peter W. Martone, Norfolk, Va., (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief) for appellant.
 Hugh S. Meredith, Norfolk, Va., (Eli Ellis and Francis L. Gannon, New York City, and Vandeventer, Black, Meredith & Martin, Norfolk, Va., and Hill, Betts, Yamaoka, Freehill & Longcope, New York City, on brief) for appellees.
 Before HAYNSWORTH, Chief Judge, BRYAN, Circuit Judge, and RUSSELL, District Judge.
 ALBERT V. BRYAN, Circuit Judge:
 
 
 1
 The M/S Bella Dan, a merchantman hailing from Denmark, suffered hull damage on May 21, 1965 when snagged by a submerged obstruction at the bridge-tunnel spanning Chesapeake Bay, just within the Virginia capes. In the suit of the Danish shipowner, J. Lauritzen, against the owner-operator of the facility, the Bridge-Tunnel District, a body corporate and politic of the State, judgment went against the defendant.
 
 
 2
 In its decree the District Court overruled the defenses of sovereign immunity generally and under the Eleventh Amendment,[1] acquitted the vessel of any want of care, and found the defendant the creator of this hazard to shipping. On appeal, while confessing liability if it can be sued, the defendant revives its claim of immunity and, alternatively lest this defense not succeed, lays concurring fault to the vessel — to make her bear a share of her damages. We refuse immunity, but we find the vessel also to blame.
 
 
 3
 The Chesapeake Bay Bridge and Tunnel District — the appellee's full legal name — was chartered by a series of acts of the Virginia legislature, the last[2] providing that the "District may sue and be sued, and by and through the Chesapeake Bay Bridge and Tunnel Commission hereinafter created as the governing board thereof, the district may plead and be impleaded, and contract with, individuals, partnerships, associations, private corporations, municipal corporations, political subdivisions of the State of Virginia, and the federal government or any agency thereof having any interest or title in and to property, rights, easements or franchises authorized to be acquired by this act."
 
 
 4
 The facts are beyond critical dispute. For present purposes the bridge-tunnel may be considered as running north and south. The principal Bay passageway for ships in and out of Hampton Roads is Thimble Shoals Channel. It transits the structure, in a general east-west direction, over the sites of the submarine tunnel sections. Thimble Shoals consists of a main channel 1000 feet in width, with an adjacent auxiliary channel of 450 feet on each side. The auxiliaries — the north for inbound and the south for outbound traffic — provide passage for vessels of 20 feet draft or less, as these are forbidden the main channel. The incident in suit occurred in or along the waters between the north shore and the north boundary of the north auxiliary. The location is also fixed as at the south end of North Island, one of the artificial causeways of the bridge-tunnel.
 
 
 5
 I. Before looking at the specifics of the causative events of the misadventure, the suability of the Tunnel District ought first to be demonstrated. Paragraphed, the defense is this. The District is a political subdivision of the State — the same status accorded a city, town or county. It is organized to perform an essential governmental function, i. e. provision of a State highway connecting the eastern peninsula of Virginia with the mainland. Indeed, the organic act gives the District a definite territory, including in its compass the counties, cities and towns situate at each end of the construction as well as the "area of Chesapeake Bay between" these termini. It thus enjoys the same optional exemption from a tort action as does the State. Elizabeth River Tunnel District v. Beecher, 202 Va. 452, 117 S.E.2d 685, 85 A.L.R.2d 469 (1961). Nor can consent to suit be extracted from the "sue-and-be-sued" or the "plead and be impleaded" clause of the siring statute. Id. at 689. This is State law but, in addition, because of the libellant's foreign citizenship, the United States courts are withdrawn as a forum by the Eleventh Amendment.
 
 
 6
 Nevertheless, libellant's replication must prevail — the State obstacle and the Constitutional impediment are both waivable and they have been disclaimed. Virginia relinquished both of these pleas by seeking and obtaining admission into an exclusive Federal realm — interstate and foreign commerce. Art. I, Sec. 8, U.S. Constitution. Necessarily, the State recognized that she built in the Bay only by sufferance of the Federal government. This acknowledgment is conclusively evidenced by her petition for permission pursuant to the act of Congress, 33 U.S.C. § 401 et seq., to occupy navigable waters with bridges and tunnels. The supplication of the State, and her reception into the Federal domain, meant surrender, pro tanto and pro tempore, of State sovereignty and submission to the paramount overlordship of the United States during the tenancy.
 
 
 7
 To begin with, whether Virginia's entry into the Federal province amounts to consent to be sued, and to be sued in the United States court, is a question of Federal law. Hence, the decision of the State court upon the State's invulnerability to suit is not conclusive in resolving the relationship of the State and the plaintiff in a dispute arising in the Federal zone. This was the declaration of Parden v. Terminal R. Co. of Ala., 377 U.S. 184, 196, 84 S.Ct. 1207, 1215, 12 L.Ed.2d 233 (1964):
 
 
 8
 "Where a State's consent to suit is alleged to arise from an act not wholly within its own sphere of authority but within a sphere — whether it be interstate compacts or interstate commerce — subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law."
 
 Furthermore:
 
 9
 "A State's immunity from suit by an individual without its consent has been fully recognized by the Eleventh Amendment and by subsequent decisions of this Court. But when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation."Ibid.
 
 
 10
 Congressional regulation allows causes involving activities in and upon the navigable waterways of the Nation to be adjudicated in the admiralty. 28 U.S.C. § 1333. Accordingly, we think liability of the Tunnel District to the Danish suitor upon the maritime tort was justiciable in the chosen instant court.
 
 
 11
 II. For an understanding of the negligence taxed to the Bella Dan, the circumstances and events of her misfortune must be particularized. These, as closely recounted in the findings of the District Court, point to its happening in this way:
 
 
 12
 "1. The M/S BELLA DAN was a twin-screw general cargo motor vessel of Danish registry 373'8" long 51'11" in breadth, with her bridge structure midships.
 
 
 13
 "At the time of the casualty, the M/S BELLA DAN was owned and operated by the libellant, J. Lauritzen, a Danish corporation.
 
 
 14
 * * * * * *
 
 
 15
 "5. On August 1, 1958, the Tunnel District obtained a permit from the United States Army Corps. of Engineers to construct a bridge-tunnel across the mouth of the Chesapeake Bay subject to certain enumerated conditions.
 
 
 16
 "One of the conditions of this permit was that the Tunnel District would provide, operate and maintain such navigational aids at the navigation openings of the bridge-tunnel as may be required by the United States Coast Guard. Further, the Tunnel District was to bear all costs arising from the installation, operation and maintenance of these aids.
 
 
 17
 "6. Thereafter, the United States Coast Guard prescribed that a navigational aid light tower should be erected by the Tunnel District off Thimble Shoals North Island marking the northern extremity of water having a minimum depth of 20 feet. The light prescribed was a three-legged steel structure, having steel pipe legs filled with cement, with creosoted wooden fenders bolted to the legs and a horizontal steel platform upon which the light itself was located. The light was officially designated as Light List Number 2642.2.
 
 
 18
 * * * * * *
 
 
 19
 "On April 15, 1964, this light tower * * * was * * * put into operation by the Tunnel District. In a Notice to Mariners, dated 8 April 1964, it was reported as being located in 23 feet of water, at mean low water. [The bridge-tunnel had been completed in 1964.]
 
 
 20
 "7. On September 13, 1964, at about 2:30 P.M., the light tower collapsed [due to heavy seas] during hurricane `Dora', at a time when it was subjected to heavy seas and strong winds from the north-east. * * *
 
 
 21
 "On September 26, 1964, a diver employed by the Tunnel District inspected the submerged light tower. He found that its legs remained fixed to the bottom and that the tower lay bent at an angle with its top pointing towards the south-west. It was completely submerged with its highest point about seven and one-half feet beneath the surface of the water at high tide.
 
 
 22
 "8. After the tower fell, the Tunnel District made no attempt to replace it, or to continue the operation of any navigational aid light to mark the shoal waters on the north side of the Thimble Shoal Channel opening in the Bridge-Tunnel, as prescribed by the United States Coast Guard and United States Army Corps of Engineers, and the Code of Federal Regulations. . . . . The Tunnel District did not mark the submerged tower; it requested the Coast Guard to do so. The Coast Guard believed marking it was unnecessary and did not mark it. Mariners were advised that the tower was submerged.
 
 
 23
 * * * * * *
 
 
 24
 "9. The purpose of the light tower was to indicate the northern boundary of water having a minimum depth of twenty feet. After it fell in September 1964, there was no aid to navigation in the area marking the northern boundary of good water (20 feet), or the shoal waters of North Island.
 
 
 25
 "10. On the early morning of May 21, 1965, the M/S BELLA DAN with a draft of 9'3" aft, entered the Virginia Capes inbound from New York to Hampton Roads. A licensed Virginia State Pilot boarded the vessel and took over the navigation of the vessel off Cape Henry at about 0150 ship's time.
 
 
 26
 "The navigational chart in use on the BELLA DAN did not show the tunnel project. However, no chart for the waters showed the light tower as a submerged obstacle. Therefore, even if the BELLA DAN had the most recent chart, she would not have had a chart showing the obstacle.
 
 
 27
 "Shortly after the pilot came aboard, the master left the bridge. The mate and helmsman remained on the bridge. No bow lookout was posted. The BELLA DAN did not use its Fathometer or radar. Neither the pilot nor any of the officers of the BELLA DAN took any navigational fixes or made any plots on the chart. The pilot relied upon visual sightings of the buoys and the lights on North Island. A bow lookout could not have seen the submerged tower.
 
 
 28
 "11. Vessels with a draft of less than 20' are prohibited from navigating in Thimble Shoals buoyed channel. Therefore, the pilot maneuvered BELLA DAN to the north of the quick flashing red buoys marking the northern boundary of Thimble Shoals Main Channel, intending to proceed parallel to the buoyed channel, remaining to the northward of said channel.
 
 
 29
 "The course of the main channel is 288 degrees. The pilot did not use the compass in navigation and he called for no readings during the vessel's trip. After the casualty the helmsman reported a course of 292 degrees.
 
 
 30
 "12. The BELLA DAN proceeded towards Hampton Roads under the pilot's orders. The weather was clear, wind, ESE, force 2, with visibility estimated to be at a good ten miles or more, and the tide was 2.8 feet above mean low water. North Island was illuminated by its lights. The distance between this island [and] the line of buoys on the northern edge of the buoyed channel was about 700 yards. The light tower lay approximately 250 yards to the southwest of the island.
 
 
 31
 "The pilot used as his navigational aids the line of quick flashing (red) buoys marking Thimble Shoals Main Channel on his port hand, and the lights of North Island on his starboard hand. As he looked up ahead, he directed his heading so as to split the distance between the channel buoys and the island which, with BELLA DAN's maximum draft of 16'3", should have given her a safe and unobstructed passage through the opening. The United States Coast and Geodetic Survey Chart corrected through April 24, 1965 showed a minimum depth of about 32' at mean low water along this course line. This course line, had it been possible to follow it exactly, should have taken the BELLA DAN a little to the southward of the point where the light tower had been standing.
 
 
 32
 "13. At about 0212, ship's time (0112 EST), May 21, 1965, the BELLA DAN struck a submerged object when abeam of and about two ship lengths off the lighted building of North Island while passing through the Thimble Shoals opening in the Chesapeake Bay Bridge Tunnel. She sustained heavy bottom damage.
 
 * * * * * *
 
 33
 "15. The BELLA DAN promptly reported the incident to the Coast Guard. Its first report, made shortly after the impact, fixed the position of the BELLA DAN at the time it struck an obstacle as 200 feet north of Buoy 8. This position was in error. It was too far south and east of the place of impact. The Coast Guard made a surface search and found nothing in the immediate area. * * *
 
 
 34
 "The only obstruction found in the area other than the rock cover of the tunnel itself was the submerged tower. A diver employed by the Tunnel District inspected the rock cover after the BELLA DAN casualty and found that it had not been disturbed. The BELLA DAN did not strike the rock cover." (All accents added.)
 
 
 35
 On the foregoing facts the District Court, after striking down the plea of immunity, concluded:
 
 
 36
 "6. Neither the owner, the master nor the crew was negligent.
 
 
 37
 "The failure of the BELLA DAN to have the most recent chart of the area did not in any way cause the casualty. The pilot did not rely upon any charts and no chart showed the light tower as a submerged obstacle.
 
 
 38
 "Both the second mate and the pilot were acting as lookouts. A bow lookout could not have seen more than they saw. He could not have seen the submerged tower.
 
 
 39
 "The master was not negligent in leaving the bridge. The mate and pilot were competent and did not require the immediate supervision of the master.
 
 
 40
 "7. No rule of law required the BELLA DAN to be navigated in a dredged channel. American Dredging Co. v. Calmar S.S. Corp., 121 F.Supp. 255, 263 (E.D.Penn.1954), affirmed per curiam, 218 F.2d 823 (3rd Cir. 1955).
 
 
 41
 "The BELLA DAN was prohibited by law from proceeding in the main marked channel. It could use the north auxiliary channel, which was marked only along the southern boundary. It was not required to use the north auxiliary channel. It proceeded to the north of the north auxiliary channel and thus left the customary fairway. The rule that a vessel leaving a customary fairway does so at her peril is applicable if the vessel strikes a natural obstruction. The Arlington, 19 F.2d 285, 54 A.L.R. 101 (2d Cir. 1927). A vessel, however, is entitled to assume that navigable waters are free of artificial obstructions. Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582 (1893).
 
 
 42
 "The area in which the pilot took the BELLA DAN was free of natural obstructions and was of sufficient depth to accommodate the draft of the BELLA DAN. The pilot was not negligent because the ship struck the submerged light tower. * * *
 
 
 43
 "The pilot was not guilty of any negligence that contributed to the casualty." (Accent added.)
 
 
 44
 We disagree with the District Court's vindication of the motor ship. Her pilot quite plainly was negligent. Carelessly conned, she ran afoul of the submerged light tower. With full knowledge of its existence in the waters into which she chose to stray, her path led from the auxiliary channel into the threatened area.
 
 
 45
 Attempting, in his words, "to split the distance" between North Island and flashing buoy 8 — the nearest of those marking the division between the main and northbound auxiliary channel — the craft's actual position was 1000 feet off the pilot's estimate. Truth is he did not know where he was. Admittedly, his vessel was not obligated to keep within the auxiliary and was in no danger of stranding, but nonetheless she was ignoring the known portending menace.
 
 
 46
 Due apparently to overconfidence and routine familiarity, the pilot used none of the navigational devices available to evaluate his own perception. Neither taking fixes himself, nor directing the ship's crew to do so, he gave the helmsman no course to follow. He simply picked his way by "eyeball".
 
 
 47
 No bow lookout had been posted. The significance of this omission is slighted by the appellee shipowner. True, a lookout could not have seen the submerged object but, properly instructed, he could have observed the Bella Dan's divergence from the line of channel buoys into a dangerously close approach to North Island. The need for the lookout is conspicuously exposed here by the inattentiveness of the pilot and the mate.
 
 To repeat:
 
 48
 "[W]e hold that the omission to perform this duty is so grave a default as to give rise to a strong inference that it contributed to the accident and to impose upon the vessel the heavy burden to show by clear and convincing evidence that it did not so contribute." Anthony v. International Paper Co., 289 F.2d 574, 581 (4 Cir. 1961); see Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 332 F.2d 211 (4 Cir. 1964).
 
 
 49
 This burden is not satisfied by the Bella Dan's argument that the hazard was hidden and so would not have been within the scan of a watch. For absolution, she has to establish that he could not have detected the deviation projecting the Bella Dan into danger.
 
 
 50
 Next is the question whether the pilot's neglect can be imputed to the shipowner, for he was taken aboard solely in obedience to Virginia's statute. The negligence of a compulsory pilot cannot ordinarily be used to impose in personam liability on a shipowner. Homer Ramsdell Transp. Co. v. La Compagnie Générale Transatlantique, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); Gilmore & Black, Admiralty 429 (1957). But from this it does not follow that the shipowner can here recover full damages notwithstanding the concurring pilot-negligence, for the ship's crew too was neglectful. The master completely abandoned navigation of the Bella Dan to the pilot, leaving the bridge to read a newspaper. A pilot's presence on the bridge does not lessen the master's duty and authority. See Jure v. United Fruit Co., 6 F.2d 6 (5 Cir. 1925); Barbey Packing Corp. v. The S.S. Stavros, 169 F.Supp. 897 (D. Ore.1959). The master's function was not in this case performed by the mate, who apparently did not recognize any affirmative duty to supervise the progress of the ship.
 
 
 51
 The shipowner is responsible if the master fails to act to correct endangering movements of the ship, even when a statutory pilot is ostensibly the steersman, Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, 32 F.2d 209 (2 Cir. 1929). Liability has also been declared, in a compulsory pilot situation, where the master failed to insure that maneuvering signals were properly given and received. City of Los Angeles v. Standard Transp. Co., 32 F.2d 988 (9 Cir. 1929). A fortiori, liability is clear when the master leaves the wheel entirely to the pilot's judgment, and moves to where he cannot possibly oversee him.
 
 
 52
 The ship's negligence was even further proved, aside from her crew's acquiescence in the pilot's inadequacy. She did not have a current chart. While it would not have revealed the lurking subsurface tower, it would have disclosed its absence, for it was an officially designated light, No. 2642.2. The ship's personnel, too, should have made instrument verification of the pilot's seamanship, especially when he was navigating by "eyeball". It was also incumbent upon her to station the lookout at or near the forecastle.
 
 
 53
 These factors add up to negligence on the part of the ship sufficient to fasten in personam liability on her owner, notwithstanding the man in charge was not of her choosing. Navegacion Castro Riva v. The M.S. Nordholm, 178 F.Supp. 736, 740 (E.D.La.1959); The Paris, 37 F.2d 734, 744 (S.D.N.Y.1930).
 
 
 54
 In rem answerability of the vessel is not in this case, because she was not a party. Moreover, no claim for damages has been asserted by the defendant. It only pleads diminution of the plaintiff's claim. However, we believe that the admiralty practice of dividing damages in joint fault is applicable here, and the shipowner must bear one-half of her own damages.
 
 
 55
 A decree will be passed in accordance with this opinion, and the cause returned to the District Court for the assessment of damages.
 
 
 56
 Affirmed in part; reversed in part; and remanded.
 
 
 
 Notes:
 
 
 [1]
 Amendment XI: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
 
 
 [2]
 Acts of the General Assembly of Virginia, 1962, c. 605, p. 925, approved March 31, 1962. The original act, approved April 7, 1954, is contained in Acts of the General Assembly of Virginia, 1954, c. 693, p. 883; the first amendment, approved March 30, 1956, is at Acts of the General Assembly of Virginia, 1956, c. 462, p. 676