Gilbert **DALLDORF**, Appellee,

v.

**HIGGERSON–BUCHANAN, INC.,**
**Appellant.**

Gilbert **DALLDORF**, Appellant,

v.

**HIGGERSON–BUCHANAN, INC.,**
**Appellee.**

Nos. 12106, 12107.

United States Court of Appeals
Fourth Circuit.

Argued May 8, 1968.

Decided Sept. 27, 1968.

J. Riley Johnson, Jr., and Thomas R. McNamara, Norfolk, Va., (Williams, Worrell, Kelly & Worthington, Norfolk, Va., on brief) for Higgerson-Buchanan, Inc.

Morton H. Clark, Norfolk, Va., (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief) for Gilbert Dalldorf.

Before SOBELOFF, BOREMAN and WINTER, Circuit Judges.

SOBELOFF, Circuit Judge:

Dr. Gilbert Dalldorf brought an action against Higgerson-Buchanan, Inc., to recover for damages to his sloop, the WANIGAN, sustained when the sloop's mast came into contact with power lines of the Virginia Electric & Power Company passing over a new channel then in the process of being dredged by the defendant. After trial on the issue of liability, the District Court entered an interlocutory decree in which it held both parties guilty of negligence and equally at fault. Since this was an admiralty action, the court applied the doctrine of comparative negligence and awarded the plaintiff one-half of his provable damages.

Both parties appealed, each asserting his own freedom from negligence and assigning error to the trial court's findings to the contrary. We affirm the finding that the defendant was negligent but do not sustain the finding of contributory negligence against the plaintiff.

On the morning of May 1, 1966, the plaintiff was operating the vessel in the Inland Waterway under power in a northerly direction toward the Elizabeth River. Some distance north of the locks at Deep Creek, he approached a divide in the channel, which looked like the arms of a Y. His chart did not indicate the existence of this divide. Deliberating the situation and concluding that the channel to the right was a continuation of the main channel, the plaintiff entered. After proceeding approximately fifteen hundred feet into this channel, the sloop's mast struck three power lines strung forty feet above the water, resulting in the damages for which the plaintiff now seeks redress.

The channel or "cut" in which the accident occurred was being dredged by the defendant contractor pursuant to a contract with the Virginia State Department of Highways and was of approximately the same width and appearance as the old channel. The contract also called for the filling of the existing channel and it was contemplated that the proposed Interstate Highway 64 would run, in part at least, along the path of the pre-existing channel. Dredging had begun in January, 1966, and a sign reading "Slow to Stop—Dredging Operations Ahead" was placed on the west bank of the waterway four hundred feet south of the division in the channel. The overhead wires which caused the damages complained of passed over the old channel at a height of one hundred feet, as shown by the navigator's chart in plaintiff's possession. Overland, however, the wires were carried at a level of only twenty-five feet. The Virginia Department of Highways had contracted with Virginia Electric & Power Company to raise the wires to one hundred feet over the new channel, but at the date of the accident the wires over the new channel had been raised to a height of only forty feet.

On this appeal defendant contends that it had no legal duty with respect to the overhead wires and therefore cannot be held to have been negligent. In support of this contention, it relies on a number of cases declaring that a contractor has no duty to exercise reasonable care to warn of the existence of obstacles which he did not create, over which he had no control, and which are in no way connected with his work. See White v. White Consolidated, Inc., 157 F.2d 758 (7 Cir. 1946); Blanksten v. United States, 236 F.Supp. 280 (N.D. Ill.1964); Thornton v. United States, 236 F.Supp. 651 (S.D.Miss.1964).

■ We do not quarrel with the abstract proposition, but it is without relevance here. As we view the relationship of the defendant's dredging operations to the overhead wires, the defendant did in fact create the hazard that resulted in the virtual destruction of the WANIGAN. The defendant's activities were designed to transform the terrain into a navigable channel. It is undisputed that the defendant was dredging the new channel with actual knowledge that the wires were originally only twenty-five and later forty feet above the water. While prior to the defendant's activities there was no foreseeable danger that anyone or anything would come into contact with the highly charged transmission lines, this was no longer the case once the new channel was begun and left open to easy access. The lines which posed no threat previously were converted into a menace by the defendant's action. It was then reasonably foreseeable by the defendant that the newly created situation presented a threat of harm to anyone who might mistakenly enter the new channel.

■ It is an elementary principle of negligence law that a person who creates a risk of foreseeable harm to others is under a duty to exercise reasonable care

422

to prevent the threatened harm. The American Law Institute's Restatement Second of the Law of Torts declares that "negligent conduct may be * * * an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another," Section 284, or an act or omission involving "an unreasonable risk of harm to another," Section 302. And the Comment to the latter section states that "[i]n general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act." The same idea was aptly stated in the recent case of Gowdy v. United States, 271 F.Supp. 733 (W.D.Mich.1967), "[d]uty is born of danger to others reasonably perceived by the person charged with guarding against the hazard." As the defendant's duty springs from its having brought about the risk of harm to others, it is immaterial that it did not own the wires, had not placed them there, and had undertaken to do nothing directly to them.

■ By the above legal criteria the defendant fell short of its duty. The only step taken by the defendant which might tend to protect those whom it had endangered was the placing of a "warning" sign four hundred feet from the divide in the channel. As noted, the sign read: "Slow to Stop—Dredging Operations Ahead." Against what danger can this be said to caution an observer? It was entirely useless as a warning of the peril which in fact resulted in this casualty—contact with overhead wires. It was, moreover, insufficient to charge the plaintiff with notice that the proper channel was to the left and that the channel to the right was hazardous and should be avoided. In fact, in warning the navigator of "dredging operations ahead" the sign impliedly assured him that the site of the dredging operations was in the main channel. In this respect it was deceptive. The sign was clearly inadequate as a warning either to stay out of the new channel or

to beware of the overhead hazard. The failure so to warn was negligence, and the District Court's finding to this effect is therefore accepted.

■ However, a careful review of the evidence in light of well-established legal principles persuades us that there is no ground for holding plaintiff contributorily negligent. On the morning in question, plaintiff was in the cabin, seated at the steering wheel. He passed the sign and approached the newly created Y in the channel. The plaintiff testified that he did not see the sign but, as we have just noted, even if he had, it would have told him nothing pertinent to the wire hazard. One may readily visualize circumstances in which failure to observe a sign would constitute contributory negligence. This is not the case here because this sign conveyed no adequate warning and plaintiff's failure to see it in no way influenced the event under inquiry. At most, the sign can be said to charge the plaintiff only with such knowledge as it would have imparted.

Upon reaching the confluence of the old channel with the new, the plaintiff consulted his chart which gave no indication of the new cut. Since the waterway was unbuoyed, the plaintiff had to rely on his eyesight and seamanship in seeking the good water. He followed the course which to all appearances was the main channel. At the time of the accident, no dredging was actually going on because it was early Sunday morning. The plaintiff testified that it was obvious to him that the channel he had chosen had been recently dredged because of the "skinned" appearance of the banks and the presence of dredging pipes on the banks, but this is precisely what he would expect to see if the dredging was in the old channel. He also testified he believed at all times that he was in the main channel, and there was nothing to indicate the contrary. The overhead wires were fifteen hundred feet up the new channel and were supported by two poles seventy-five feet in height one hundred feet

distant from the banks. A dredge yellow and white in color was situated nine hundred feet beyond the wires at the point to which the dredging had been completed, and the plaintiff testified that from his vantage point he did not see the poles supporting the wires, the dredge, the end of the new channel, or the wires which caused the accident. As shown by the testimony and exhibits the view from the entrance to the channel was not complete because of a bend, and this was perfectly consistent with the chart. The plaintiff testified that his attention was directed to the water as he was continually seeking to remain in good water and that the sun's glare impaired his vision somewhat. On the basis of these facts, the District Judge found the plaintiff had been contributorily negligent.

In determining whether the plaintiff's conduct falls below the standard of care to which he should conform, we must first ascertain that standard. The Second Circuit has articulated what we deem to be the controlling test in cases in which the issue is whether the navigator exercised due care. That court said, "Navigators are not to be charged with negligence unless they make a decision which nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances shown." W. H. Baldwin, Kenny v. Cornell Steamboat Company, 271 F. 411 (2 Cir. 1921).

The plaintiff cannot be faulted for failing to avoid the wire hazard unless he knew or reasonably should have known of that danger or unless his negligent navigation caused the ship to enter the zone of immediate peril. It is undisputed that he had no actual knowledge of the wires.

We adhere to the principle that "[t]he attention which one must pay to his surroundings * * * is not a legal absolute and will vary with the type of situation and the circumstances." City Specialty Stores v. Bonner, 252 F.2d 501, 504 (6 Cir. 1958). See also Tipton v. Barge, 243 F.2d 531 (4 Cir. 1957). The fact that he was on notice of defendant's dredging operations is beside the point. Even if the dredges had been seen when plaintiff entered the new channel or at some point after entering it, the fact of their presence would tend to focus his attention on the depth of the water in which he was proceeding and divert him from attention to the presence of overhead objects, such as the wires.

We cannot agree that the plaintiff was negligent in steering from the cabin. He was under no duty to position himself outside the craft because his cabin station afforded him an unobstructed view of the water, and he could reasonably foresee danger only in the water or near the surface, not far overhead. His navigator's chart showed the wires to be one hundred feet overhead; once he reasonably entered what he thought was the main channel the chart gave him assurance that the wires posed no hazard. Under these circumstances we cannot say that the plaintiff should have been alert to a wire hazard.

Nor can we accept the contention that the plaintiff improperly utilized his chart and thereby negligently exposed the sloop to the wire hazard. The fallacy of the contention is that it ignores the fact that the defendant had altered the topography shown on the chart and made it to appear that the channel which it had dug and left open to access was a continuation of the main channel. The chart used by the plaintiff was small in scale, and one could not readily ascertain which was the new channel and which was the old. No claim is made that plaintiff did not employ a proper chart. In interpreting the situation as he did the plaintiff acted reasonably and did not fail in ordinary prudence.

The instant case is distinguishable from the one recently decided by this court in Chesapeake Bay Bridge and Tunnel District v. J. Lauritzen, 404 F.2d 1001 (4 Cir. May 2, 1968) where we found the pilot partially at fault when he

deviated far off course into the area of danger and collided with a submerged light tower with full knowledge of its existence. We found him guilty of a negligent error in navigation in not discovering this deviation. In the instant case, the plaintiff's entry into the new cut was innocent, for as a result of defendant's activity the cut was to all appearances a continuation of the main channel.

Our conclusion is that the District Court's finding that the plaintiff was contributorily negligent was clearly erroneous and the decree of the court is modified to award the plaintiff 100% of his provable damages.

The judgment of the District Court is

Affirmed as modified.

BOREMAN, Circuit Judge (dissenting in part).

The decision of the majority is that the negligence of the defendant was the sole proximate cause of the damage to the plaintiff's yacht and that the plaintiff was free of contributory negligence. Having had the distinct advantage of hearing the witnesses and observing their demeanor as they testified, the district court found the facts and reached the conclusion that, although the defendant was negligent, the plaintiff's conduct was so contributorily negligent under the circumstances as to require a division of damages in admiralty.

There was testimony before the court that the overhead "line," consisting of three cables, was located approximately 1500 feet from the entrance to the new channel being dredged. There was evidence that from 600 to 900 feet beyond the electric wires the dredging operations ended and at that point the dredging equipment was located. (The district judge fixed this distance at 600 feet.) The dredge, at the end of the cut or new excavation, was painted yellow and white; it was located on a barge and the hull of the barge extended about two feet above the water; the house on the dredge extended upward another eight feet and the lever room extended above that approximately another eight feet. There was evidence that the dredge itself was visible from the west end of the new excavation as was also "the end of the new excavation, that part where it was going to go but had not yet been excavated," and that there was nothing, such as a curve, from the entrance of the new channel looking eastward, to obstruct the view of the offending wires, the dredging equipment or the "dead end" of the dredging operations.

The "warning" sign, 400 feet from the dividing channels and to the port side, read: "Slow to Stop—Dredging Operations Ahead." As the majority opinion points out, this sign may have been insufficient to charge the plaintiff with notice that the proper channel was to the left and that the channel to the right was hazardous and should be avoided. However, the plaintiff admitted that he saw no such sign which fact, in itself, is persuasive evidence that he was not keeping a proper lookout since, according to his own testimony, he failed to see the wires, the dredging equipment, the end of the dredging operations, the boats used in connection with such operations,—anything which should have put a reasonably prudent navigator on notice that he was entering the wrong channel in disregard of the safety of his craft.

Plaintiff had traveled this portion of the inland waterway on several prior occasions in recent years and, therefore, had acquired some familiarity therewith. He had again traveled southwardly through this same waterway only a few months prior to the accident. He was no stranger to the area. On the morning of the accident, according to his own testimony, he had been following a chart of the waterway until the "Y" created by the new excavation came into view. Instead of following the charted course which distinctly bore to the left and did not disclose the new excavation abruptly to the right he discarded the chart and undertook to rely for guidance upon his vision. With the sun in his eyes which admittedly impaired his vision he en-

tered the right channel and continued straight ahead.[1] According to the plaintiff's own testimony, he and his wife had arisen early to get through the lock as they wanted to "get through the harbor and start up the bay early." They were proceeding at a speed of approximately six knots, which was the maximum speed of the craft then being propelled by its inboard motor. As the yacht approached the "Y," although the district court stated in its written opinion filed in the case that the plaintiff slowed down, the plaintiff himself was uncertain as to his change of speed.[2]

The district judge, in finding the plaintiff guilty of contributory negligence, explained as follows:

"The plaintiff, Dr. Dalldorf, was guilty of contributory negligence. Here the doctor was an experienced navigator who had been through this inland waterway on numerous occasions. He was fully cognizant with the use of charts and their relevancy to this particular type of navigation. On the morning in question, he had such a chart with him on which was accurately outlined the area from the Deep Creek Locks to the Elizabeth River. It showed distinctly the bend in the waterway which the doctor was approaching at the time he took his eventful wrong-way trip to the right. It did not show any newly constructed, *straight*, canal to the right. Not only would reasonable precautions have indicated to the doctor, on the basis of time traveled and speed, exactly where he was located, but even a casual observation of the chart would indicate the bend of the channel to the left as it follows the 'U' as has been described elsewhere in this memorandum. The doctor realized that he was in a point of danger, he actually slowed down and pondered as he approached his point of departure. Nevertheless, he proceeded though conning his vessel from the small cabin, a point of relatively limited visibility and was, in his own words, not looking for overhead wires, but trying to find 'good water'. He did not see the dredge itself which was painted in bright colors and was only 600 feet ahead of him as he approached the overhead wires. His failure to be more observant when in a position where he had some inclination of

---

1. Q. You were heading in a generally easterly direction at that time were you not?

A. Yes, I was a little—I have to refresh myself here. Yeah. Well, *I remember it was early because afterwards we wondered if we had seen those lines.* It was early in the morning. *The sun was low in the horizon, you know, and maybe we would have seen them if the sun hadn't been ahead of me in my eyes.*

Q. That was really my question. Where was the sun with relation to the channel and the wires and so forth?

A. Well, I think it must have been fairly—I know that the low sun, *much of that run down there had been a problem,* you know. *There had been sun glare on the water* and I think it must have been—I don't remember just what the position of the sun in May was there but *I know that we had that problem of the sun in my eyes when we were going down the creek.* (Emphasis supplied.)

2. Q. Doctor, having made the choice, did you have any other questions about the fact that this was the proper channel? Was there anything to alert you to the fact that you may have been in the cut?

A. Well, no. As I said, though, *we hadn't any assurance of just where we were in Deep Creek,* you know. There were certain—what I was doing was trying to follow the deep water and *we had hesitated there* and then—

Q. When you say hesitated what do you mean? Had you actually cut your engine off?

A. Well, *I don't know whether we had slowed down or not* but we had considered both of these possibilities and then we proceeded in there *because that seemed to be the channel,* because it was being dredged. But there was—we were already looking for markers on the Elizabeth River as far as I was concerned. We were getting into the area where we might hope to pick up some of those buoys. You see them there quite a distance before you reach them, because it is all so shallow there. (Emphasis supplied.)

danger; his failure to assume a position on the outside of the craft where the dangers, if present, would be more visible to him; his putting the chart aside when it would have been of greater importance to him than in any other point in his travels along that waterway and his failure in his own words, to look in the air constituted negligence and contributed proximately and in considerable degree to the difficulties encountered in this matter."

Under the circumstances as clearly disclosed by the evidence I cannot join in the conclusion of my brothers that the lower court's finding with respect to the plaintiff's contributory negligence was clearly erroneous, either in fact or in law. I would affirm.