983 F.2d 578
 142 L.R.R.M. (BNA) 2139
 U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES, SOCIAL SECURITY
ADMINISTRATION, BALTIMORE, MARYLAND, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
American Federation of Government Employees Council 220, Intervenor.
 No. 91-1781.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 4, 1992.
Decided Dec. 30, 1992.
 
 Jacob Matthew Lewis, Civ. Div., U.S. Dept. of Justice, DC, argued (Stuart M. Gerson, Asst. Atty. Gen., William Kanter, on the brief), for petitioner.
 Frederick Michael Herrara, Federal Labor Relations Authority, DC, argued (William E. Persina, Sol., William R. Tobey, Deputy Sol., on the brief), for respondent.
 Stuart Alan Kirsch, Asst. Gen. Counsel-Litigation, American Federation of Government Employees, AFL-CIO, College Park, GA, argued (Mark D. Roth, Gen. Counsel, on the brief), for intervenor.
 Before MURNAGHAN and WILLIAMS, Circuit Judges, TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 The American Federation of Government Employees, Council 220 (Union), brought a grievance against the United States Department of Health and Human Services, Social Security Administration (SSA), alleging unfair labor practices. The Union contended that the Federal Service Labor-Management Relations Statute (Title VII of the Civil Service Reform Act of 1978), 5 U.S.C.A. §§ 7101-35 (West 1980 & Supp.1992), obligated the SSA to negotiate over a proposed incentive program. An arbitrator determined that the incentive program was not negotiable because of the SSA's authority under Title VII to determine its own budget. See id. § 7106(a)(1). The Union appealed to the Federal Labor Relations Authority (FLRA), which determined that the incentive program was negotiable and that the arbitrator had failed to consider impact and implementation arrangements under § 7106(b)(2) and (3). The SSA then petitioned this court for review pursuant to § 7123(a)(1). We grant the petition for review and reverse the FLRA's determination that Title VII required the SSA to bargain over its incentive program. We affirm, however, the FLRA's determination that the arbitrator should have considered impact and implementation arrangements under § 7106(b)(2) and (3).
 
 
 2
 * In October 1988, the SSA put into effect a "budget incentive pilot/gainsharing program." Under this incentive program, money previously budgeted for specific purposes was reallocated as one lump sum for local managers to allocate at their discretion. Fifty percent of any savings achieved at the work site would be returned to the managers and unit employees in the form of monetary rewards; the remainder would revert to the Social Security Trust Fund. The savings generated each year would be factored into the following year's budget through revised work factors based on the previous year's productivity. The SSA announced that the program would be put into effect unilaterally and refused the Union's request to bargain at the national level.
 
 
 3
 The Union filed a grievance claiming that the SSA had violated the parties' national collective bargaining agreement and had committed an unfair labor practice under Title VII. The grievance was submitted to arbitration. The arbitrator denied the grievance, holding that, under this court's decision in Navy Charleston Naval Shipyard v. FLRA (Charleston ), 885 F.2d 185, 187 (4th Cir.1989), Title VII does not require federal agencies to negotiate over an employee incentive program based on gainsharing.[1] The arbitrator "was not prepared to conclude 'that negotiation at the national Component level is warranted with respect to a gainsharing program' " such as the SSA had proposed. American Fed'n of Gov't Employees Council 220, 41 F.L.R.A. (No. 21) 224, 227 (June 13, 1991) (quoting from arbitrator's ruling). The arbitrator further held that "nothing in this decision is intended to relate in any manner whatsoever to whatever bargaining obligation or grievance rights ... may exist at the local level." Id.
 
 
 4
 The FLRA reversed, holding that: (1) the arbitrator's decision was inconsistent with FLRA precedent; and (2) the arbitrator had failed to address the SSA's obligation to bargain over impact and implementation arrangements as required by § 7106(b)(2) & (3) when a federal agency changes an employee's conditions of employment. Id. at 233.
 
 II
 
 5
 Title VII grants federal employees the right "to engage in collective bargaining with respect to conditions of employment." 5 U.S.C.A. § 7102(2). Title VII, however, excludes a number of subjects from negotiation, including several "management rights" enumerated in § 7106. Specifically, § 7106(a) provides that "nothing in this chapter shall affect the authority of any management official of any agency--(1) to determine the ... budget ... of the agency."
 
 
 6
 In American Fed'n of Gov't Employees, AFL-CIO, and Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio ( Wright-Patterson ), 2 F.L.R.A. (No. 77) 604 (Jan. 31, 1980), enf'd on other grounds sub nom. Department of Defense v. FLRA, 659 F.2d 1140 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982), the FLRA developed a two-prong test to determine whether a union proposal interferes with an agency's authority to determine its own budget under § 7106(a)(1). Under Wright-Patterson, a government agency need not negotiate over a union proposal if the agency can show that the proposal either (1) "attempt[s] to prescribe the particular programs or operations the agency would include in its budget or to prescribe the amount to be allocated in the budget for them"; or (2) involves "an increase in costs [that] is significant and unavoidable and is not offset by compensating benefits." Id. at 608. In the present case, the SSA contends that Title VII does not require it to negotiate over its gainsharing program because negotiation would conflict with its budgetary authority as defined in the first prong of the Wright-Patterson test. Neither party suggests that the second prong of the test applies.
 
 
 7
 FLRA precedent interpreting the first prong of the Wright-Patterson test provides that federal agencies generally must negotiate over gainsharing programs because they involve the distribution of future profits, and therefore do not interfere with budgetary programs that have already been established. American Fed'n of Gov't Employees Council 220, 41 F.L.R.A. at 230. In the present case, the FLRA applied its precedent to determine that Title VII obligated the SSA to negotiate over its gainsharing proposal. Id. at 232. In Charleston, however, we specifically disagreed with the FLRA's application of the first prong of the Wright-Patterson test and held that neither the uncertainty of future profits nor the use of percentages rather than actual dollar amounts lessens the impact on an agency's budgetary prerogative.
 
 
 8
 Charleston involved a government shipyard's profit-sharing plan under which employees would receive 50% of profits, and the remaining 50% would be used to fund capital expenditures. Id. at 186. Following the announcement of the plan, the union proposed that 80% of the profits be allocated to employee incentive bonuses, 10% to employee development, and 10% to capital expenditures. Id. We held that the shipyard did not have to negotiate with the union over the profit-sharing plan because negotiations would interfere with the shipyard's authority to determine its budget. Id. at 188. In so holding, we stated:
 
 
 9
 The proposal here at issue admittedly is not phrased in terms of an actual dollar amount. It does, however, specify a percentage of the Shipyard's profits to be distributed to employees. Once those profits become certain, the Council's proposal will "ultimately dictate a specific dollar amount." Union proposals, no matter how artfully crafted to avoid specifying dollar amounts today, nonetheless run afoul of the Wright-Patterson test if, once adopted and implemented, such proposals will have the effect of prescribing the use of agency funds in the future.
 
 
 10
 Id.
 
 
 11
 In this case, as in Charleston, the percentage of the SSA's savings to be distributed to its employees will determine the specific allocation of funds to the employees once the savings are realized. Applying Charleston, therefore, we find that Title VII does not require the SSA to negotiate with the Union over the formula used for distributing savings realized through the SSA's gainsharing program.
 
 III
 
 12
 The FLRA asks us to reexamine our holding in Charleston because of an intervening Supreme Court decision. Specifically, the FLRA points out that the panel in Charleston relied upon Nuclear Regulatory Commission v. FLRA (NRC ), 879 F.2d 1225 (4th Cir.1989) (en banc), vacated sub nom. National Treasury Employees Union v. United States Nuclear Regulatory Comm'n, 496 U.S. 901, 110 S.Ct. 2579, 110 L.Ed.2d 261, on remand, 924 F.2d 1052 (4th Cir.1990) (vacated the FLRA's bargaining order and remanded to the FLRA with instructions to dismiss the case as moot). The Supreme Court subsequently vacated our judgment in NRC and remanded for reconsideration in light of Fort Stewart Schools v. FLRA, 495 U.S. 641, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990).
 
 
 13
 A decision by a panel of this court, or by the court sitting en banc, does not bind subsequent panels if the decision rests on authority that subsequently proves untenable. Faust v. South Carolina State Highway Dep't, 721 F.2d 934, 940 (4th Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); see Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir.1990). In evaluating the authority of Charleston, we must consider whether the portion of NRC upon which the panel in Charleston relied, namely the interpretation of the language "to determine the ... budget" in § 7106(a), is consistent with the Supreme Court's opinion in Fort Stewart Schools.
 
 
 14
 In NRC, a union sought to bargain over a salary proposal for automatic cost of living increases. 879 F.2d at 1227. We held that the NRC did not have to bargain on two alternative grounds: (1) compensation was not a "condition[ ] of employment" under 5 U.S.C.A. § 7102(2); and (2) bargaining over the union's salary proposal would "interfere with the agency's right to determine its own budget" under 5 U.S.C.A. § 7106(a)(1). NRC, 879 F.2d at 1228, 1231. On the second point, we reasoned that:
 
 
 15
 Although the union's salary proposal does not prescribe a specific dollar amount, it does provide a formula which ultimately will dictate a specific dollar amount to be allocated in the NRC's budget each time the Advisory Committee on Federal pay recommends a cost-of-living adjustment to Congress and the President.... The union's salary proposal would thus clearly "affect" the NRC's authority to determine its own budget and is therefore nonnegotiable.
 
 
 16
 Id. at 1232. Although we did not explicitly mention Wright-Patterson in NRC, the discussion clearly relates to the first prong of the Wright-Patterson test.
 
 
 17
 In contrast to our en banc decision in NRC, the Supreme Court in Fort Stewart Schools held that "conditions of employment" includes compensation. 495 U.S. at 647, 110 S.Ct. at 2047. The Court also held that, because the federal agency failed to prove that the compensation proposal would cause significant and unavoidable increases in cost, it had not satisfied the second prong of the Wright-Patterson test. Id. at 653, 110 S.Ct. at 2050. The Court expressly noted that the agency had not based its challenge to the union proposal in Fort Stewart Schools on the first prong of the Wright-Patterson test. Id. at 651, 110 S.Ct. at 2049. That prong of the test, therefore, was not an issue before the Court. Moreover, because neither party challenged the standard set out in the second prong of the Wright-Patterson test, the Supreme Court expressly limited its decision to finding that the agency had failed to meet its burden of proof. Id. at 653 & n. 3, 110 S.Ct. at 2050 & n. 3.
 
 
 18
 While Fort Stewart Schools clearly overruled our interpretation of "conditions of employment," it did not challenge our application of the first prong of the Wright-Patterson test in NRC. Thus, that portion of NRC germane to our decision in Charleston, and to our decision here, is not inconsistent with the Supreme Court's decision in Fort Stewart Schools.
 
 
 19
 The FLRA nevertheless urges us not to follow NRC (and, by extension, Charleston ) because of the Supreme Court's vacatur of our judgment. We have reexamined NRC and continue to find its reasoning persuasive.[2] Because we adhere to our interpretation in NRC of § 7106(a)(1), we find no reason to reexamine our holding in Charleston.
 
 IV
 
 20
 The SSA also challenges the FLRA's determination that the arbitration award was deficient because "the Arbitrator failed to address the obligation to bargain over procedures and appropriate arrangements under section 7106(b)(2) and (3) when an agency changes conditions of employment that constitutes [sic] the exercise of a management right." 41 F.L.R.A. at 233.[3] Such arrangements are normally termed "impact and implementation arrangements." See American Fed'n of Gov't Employees, Local 2441 v. FLRA, 864 F.2d 178, 183 n. 5 (D.C.Cir.1988) (identifying "impact and implementation" as a term of art). We will only set aside the FLRA's determination if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.A. § 7123(c) (incorporating 5 U.S.C. § 706(2)(A) (1988)).
 
 
 21
 The SSA argues that while changes at the local level may require bargaining under § 7106(b), no generalizations regarding the need for bargaining can be made on the national level. Bargaining over impact or implementation arrangements at the national level would therefore serve no purpose. Until implementation proposals are made at the local level, the need for bargaining cannot be addressed.
 
 
 22
 Although the SSA may well be correct, the FLRA has not disagreed with the SSA's position. It merely held that the arbitrator had failed to address squarely whether the national or local level is appropriate for bargaining over implementation. Without further development of the record, it is impossible to determine whether the SSA is correct. In these circumstances, we cannot fault the FLRA for finding the arbitration award deficient.
 
 V
 
 23
 In summary, we grant the SSA's petition for review. We reverse the FLRA and find that the formula the SSA uses to distribute savings realized through its gainsharing program falls within the SSA's authority to determine its own budget under 5 U.S.C.A. § 7106(a)(1). We affirm, however, the FLRA's determination that the arbitration award was deficient because the arbitrator failed to consider impact and implementation issues and grant enforcement of that part of the FLRA's order.
 
 ENFORCEMENT GRANTED IN PART AND DENIED IN PART
 
 24
 MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 25
 While I concur in part, I do not agree with the majority in adopting and applying to the instant case the analysis set forth in Charleston. First, because of the Supreme Court's vacatur of our decision in NRC (followed by its dismissal for mootness), I would find the analysis therein no longer controlling law. See, e.g., O'Connor v. Donaldson, 422 U.S. 563, 577 n. 12, 95 S.Ct. 2486, 2495 n. 12, 45 L.Ed.2d 396 (1975) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect...."); Durning v. Citibank, N.A., 950 F.2d 1419, 1424 n. 2 (9th Cir.1991) ("Although [the appellant] contends that the decision was 'vacated on other grounds,' we find that contention curious. A decision may be reversed on other grounds, but a decision that has been vacated has no precedential authority whatsoever.") In so far as Charleston expressly relies on the reasoning of the vacated NRC--indeed, much of the discussion in Charleston consists of a long quote from NRC, followed by a statement that the ruling in NRC clearly controls the decision before the panel--Charleston also should not be binding precedent in the instant case. See, e.g., Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir.1990) ("[Customarily a panel considers itself bound by the prior decision of another panel, absent an in banc overruling or a superseding contrary decision of the Supreme Court."); Faust v. South Carolina State Highway Dep't, 721 F.2d 934, 940 (4th Cir.1983), cert. denied, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); Gladhill v. General Motors Corp., 743 F.2d 1049, 1050-51 (4th Cir.1984) ("As a single panel of this court, we lack authority to reexamine or to overrule [the prior panel] short of an intervening Supreme Court decision warranting such action."); Hutchins v. Woodard, 730 F.2d 953, 957 (4th Cir.1984) ("[W]e, as a panel of the court, are bound to give controlling precedential effect to earlier decisions of the Court, absent a clear and sufficient reason not to do so.").
 
 
 26
 The majority and the concurrence conclude that Charleston is binding precedential authority and proceed to reach a result that depends on its logic. As a second reason why I have concluded that Charleston should not be here determinative, even if one assumes arguendo that Charleston continues as binding precedent despite the vacatur of NRC, the instant case is readily distinguishable from Charleston. A substantial difference exists between the proposal at issue here and the one discussed in Charleston. In Charleston, the allocation of profits was at issue, and the Shipyard's "budget" came into being largely from the proceeds and profits of its contracts:
 
 
 27
 The Shipyard is among a unique breed of Department of Defense operations known as "industrially funded activities." Much like a commercial shipyard, the Shipyard submits bids in competition with private contractors to do maintenance work for its "customer," the Navy. A significant portion of the Shipyard's operating revenues come from the proceeds of contracts it successfully bids for, including whatever "profit" it makes.
 
 
 28
 Navy Charleston Naval Shipyard v. FLRA, 885 F.2d 185, 186 (4th Cir.1989). Thus, no budgeted amount was determined in advance of the identification of the proceeds and profits. That is a controlling distinction from the case presently under consideration. The union in Charleston sought to negotiate over the percentage allocation of any profits earned under the Shipyard's contract with the Navy to refurbish two ballistic missile submarines. The profits normally would have been subject solely to management's discretion and control, without union participation, and would have been directed to various operating expenses. The Charleston court held that
 
 
 29
 the proposal completely divests Shipyard managers of discretion and control over the allocation of profits to be realized. It is this discretion and control over agency's funding decisions that Congress expressly reserved to managers in § 7106(a)(1).
 
 
 30
 Because the [union's] proposal will have the ultimate effect of eliminating the Shipyard's control over how to allocate its profits, the proposal interferes with the Shipyard's prerogative to determine its budget.
 
 
 31
 Id. at 188 (citation omitted).
 
 
 32
 By significant contrast, the proposal in the instant case to negotiate over the distribution of the savings neither requires the SSA to include a new program in the budget nor demands that it spend a specific amount in the budget. In the instant case, the Union seeks to negotiate only after the budget is set and the funds have been allocated by management. Negotiations over the profit-sharing plan in Charleston, however, would have intruded directly on management decisions to allocate its "budget" once those funds were received. The relationship between the money at issue and the managers' "budgets" is significantly different in the two cases.
 
 
 33
 The SSA itself here admits that under the incentives program, the budget has previously been determined:
 
 
 34
 The Agency's budgetary incentives program diverges from the general practice at many federal agencies of providing managers with operational funds earmarked for particular purposes. Under the program, the managers of eight areas and two districts were to be provided with a lump sum to fund their operations, to be allocated in large part as they choose.
 
 
 35
 Brief for the Petitioner, SSA, at 5 (emphasis added). Each manager at a site thus will allocate the lump sum, previously provided for in the budget, as he or she may see fit. Bargaining over the distribution of any savings which will come later, i.e., remaining at the end of a year, does not affect the amount or the dispersal at the outset of the lump sum or the local managerial decisions allocating the funds.[1] Thus, to the extent that any savings are generated, the division of that money previously budgeted between the Social Security Trust Fund and employee awards is negotiable.[2] Compare United States Dep't of the Army v. FLRA, 977 F.2d 1490 (D.C.Cir. Nov. 6, 1992).
 
 
 36
 The FLRA defined the term "budget" when formulating the Wright-Patterson[3] test. Adopting the dictionary meaning, it defined "budget" as "a statement of the financial position of a body for a definite period of time based on detailed estimates of planned or expected expenditures during the period and proposals for financing them." Wright-Patterson, 2 F.L.R.A. at 608 (quoting Webster's Third New International Dictionary (Unabridged) (1966)). Under a common-sense view of the budgetary process, the proposal at issue focusses on a sum outside of the budget. Thus, "determining the budget" in the instant case begins with the calculation of and provision of the lump sum (i.e., the "budget") to local managers and then ends, with a process distinct from the budget itself, as each manager implements his or her cost-allocations among various programs and operations.
 
 
 37
 I do not agree with the majority in preventing negotiations because the Union proposal will determine the "specific allocation of funds to the employees once the savings are realized." Title VII attempts to strike a balance between employer and employee. It recognizes the benefits of collective bargaining yet preserves management's right to manage its affairs effectively and efficiently. See, e.g., United States Dep't of Health & Human Servs. v. FLRA, 844 F.2d 1087, 1090-92 (4th Cir.1988) (noting the balance struck between "the public interest served by collective bargaining" and the interest served by an "effective and efficient government"). The majority's expansive view of nonnegotiable issues tips that balance and effectively guts the right to bargain over any conditions of employment.
 
 
 38
 The holding of the majority expands the first prong of the Wright-Patterson test. The first prong focuses on the budget process, not the mere use of agency funds already budgeted. See, e.g., Fort Stewart Schools v. FLRA, 495 U.S. 641, 652, 110 S.Ct. 2043, 2050, 109 L.Ed.2d 659 (1990) ("Petitioner does not take issue with the Authority's premise that § 7106 does not make a proposal nonnegotiable simply because it 'imposes a cost upon the agency which requires the expenditure of appropriated agency funds.' ") (quoting Wright-Patterson, 2 F.L.R.A. at 607). In the instant case, although bargaining over the division of savings generated by each site's cost-saving measures ultimately would direct the allocation of "money," such negotiations would not involve the union in budget determinations, in violation of the first prong of the test. Under the incentives program, the size of the budget and the allocation of a lump sum to various programs already will have been decided by the SSA long before the savings (if any) can be ascertained and distributed. Thus, although the proposal to bargain addresses the use of funds, it clearly does not intrude on budgetary decisions and satisfies the first prong of the Wright-Patterson test.
 
 
 39
 I therefore dissent and would require the SSA to bargain with the Union over the formula to determine percentages used for the allocation to employees of savings generated by the incentives programs, as those funds, if any, exist only in the aftermath of the provision and allocation of the budget. I agree with the majority in affirming the FLRA's determination that the arbitration award was deficient for failing to consider impact and implementation arrangements under 5 U.S.C.A. § 7106(b)(2) and (3).
 
 TILLEY, District Judge, concurring:
 
 40
 While I concur with the holding in all parts of Judge Williams' opinion, including adoption of the rationale in NRC v. FLRA, 879 F.2d 1225 (4th Cir.1989) (en banc), vacated, 496 U.S. 901, 110 S.Ct. 2579, 110 L.Ed.2d 261, on remand, 924 F.2d 1052 (4th Cir.1990), I also believe our disposition of Part III is controlled by the panel decision in Navy Charleston Naval Shipyard v. FLRA, 885 F.2d 185 (4th Cir.1989), which I view as continuing precedent despite the vacatur of NRC. The rule of interpanel accord, long recognized in this circuit, provides that one panel of this court customarily considers itself bound by the prior decision of another panel absent an en banc overruling or a contrary Supreme Court decision. See, e.g., Capital Produce Co., Inc. v. United States, 930 F.2d 1077 (4th Cir.1991); Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir.1990). I do not read the rule stated and applied in Faust v. South Carolina State Highway Department, 721 F.2d 934 (4th Cir.1983), to announce a different approach, i.e., that a case relied upon in Charleston should be reexamined for a determination of its continuing vitality. Instead, I believe Faust mandates that the holding of Charleston itself should be examined in light of subsequent intervening authority.
 
 
 41
 The question in Faust was whether to follow as precedent Chesapeake Bay Bridge and Tunnel District v. Lauritzen, 404 F.2d 1001 (4th Cir.1968), a panel opinion whose holding on the point at issue had been eroded by intervening Supreme Court authority. Lauritzen, an Eleventh Amendment case, had held that " 'when a state leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation.' " Lauritzen, 404 F.2d at 1004. Consequently, according to Lauritzen, "when Virginia constructed and maintained a bridge-tunnel spanning the Chesapeake Bay at the Virginia capes--clearly navigable waters of the United States--Virginia consented to be sued for damages sustained from a submerged obstruction in the waters." Faust, 721 F.2d at 941. Faced with a similar question of Eleventh Amendment amenability, the panel in Faust found that "Lauritzen has been sufficiently undermined by subsequent Supreme Court decisions that it should no longer be followed." Id. at 936. Specifically, the Supreme Court in Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), had held in the meantime that "a state waives its immunity by entering an area subject to congressional regulation only where the governing statute required such a waiver 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " Faust, 721 F.2d at 941.
 
 
 42
 Contrary to the situation in Faust, there has been no intervening authority to erode the direct holding of Charleston. As Judge Williams so ably demonstrates, Ft. Stewart Schools v. FLRA, 495 U.S. 641, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990), addressed only the first prong of the Wright-Patterson test whereas Charleston applied the second.
 
 
 43
 To hold that Charleston might not be binding precedent because NRC --one of the cases upon which it relied--was subsequently vacated, may open the proverbial Pandora's box. Often, a case which the Supreme Court ultimately vacates is cited as authority before it has completed the tortuous journey leading to its vacatur. Without question, NRC was valid precedent when followed by Charleston. If we strip all precedential value from the progeny of a subsequently vacated case, we contribute uncertainty to our case law.
 
 
 44
 It seems to me that the only certain approach to determining the continued validity and precedential value of a case is to hold up that particular case--here, Charleston--to the light of day and see whether the concrete holding of that case has been eroded by intervening authority. This is the rule traditionally recognized in this Circuit and the rule whose application, in my opinion, requires that our panel be bound by the holding in Charleston.
 
 
 
 [1]
 "Gainsharing" is usually used to describe profit-sharing incentive plans used in private industry. See Daniel J.B. Mitchell, Inflation, Unemployment and the Wagner Act: A Critical Reappraisal, 38 Stan.L.Rev. 1065, 1087-89 (1986). The SSA proposal extends this concept to incentive programs used to generate savings in bureaucratic overhead
 
 
 [2]
 Because we adopt NRC 's reasoning, we do not address the extent, if any, to which NRC continues to have precedential weight. Compare Harris v. Board of Governors, 938 F.2d 720, 723 (7th Cir.1991) (vacatur due to mootness on subsequent appeal does not destroy precedential weight of court's opinion) with Ridley v. McCall, 496 F.2d 213, 214 (5th Cir.1974) (vacatur destroys precedential value of court's opinion)
 
 
 [3]
 Section 7106(b) provides in pertinent part:
 Nothing in this section shall preclude any agency and any labor organization from negotiating--
 (2) procedures which management officials of the agency will observe in exercising any authority under this section; or
 (3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.
 
 
 [1]
 The SSA points out that the savings generated during the program's first year will have an affect on the lump sum to be allocated at each location the following year. Reply Brief for Petitioner, SSA, at 6. Bargaining over the percentage allocation of savings from a budgetary amount already established, however, does not affect management's right to implement cost-cutting decisions that may (or may not) generate any savings to be allocated
 
 
 [2]
 Once senior management decides to budget for the purchase of, say, ten automobiles, its subsequent decisions regarding what models to purchase--a Corvette, Duster, or Mustang--are not new budget items
 
 
 [3]
 2 F.L.R.A. (No. 77) 604, 607-08 (Jan. 31, 1980), enf'd on other grounds sub nom. Department of Defense v. FLRA, 659 F.2d 1140 (D.C.Cir.1981), cert. denied, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982)