Alean Hester FAUST, Administratrix of the Estate of Charles Lonnie Faust, Deceased, Plaintiff,

v.

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Defendant,

and

United States of America, Defendant and Third Party Plaintiff.

Tommy BENNETT, Plaintiff,

v.

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT, Defendant,

and

United States of America, Defendant and Third Party Plaintiff.

Curtis L. MULDROW, Plaintiff,

v.

SOUTH CAROLINA STATE HIGHWAY DEPARTMENT,

and

United States of America, Defendant and Third Party Plaintiff.

Civ. A. Nos. 78–776, 78–778 and 78–780.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 11, 1981.

James C. Rushton, III, William P. Hatfield, Reginald C. Brown, Jr., and Peter D. Hyman, Florence, S. C., Hal Strange and Douglas L. Hinds, Georgetown, S. C., for plaintiff Faust.

D. A. Brockinton, Jr., Brockinton, Brockinton & Smith, P. A., Charleston, S. C., for plaintiffs Bennett and Muldrow.

Ellison D. Smith, IV, Charleston, S. C., Victor S. Evans, Deputy Atty. Gen., Columbia, S. C., for defendant S. C. State Hwy. Dept.

Heidi Solomon, Asst. U. S. Atty., Charleston, S. C., Rosemary Denson, Torts Branch, U. S. Dept. of Justice, Washington, D. C., for defendant U. S. A.

HAWKINS, District Judge.

These cases consolidated for trial and heard by this court during its term beginning November 16, 1981, in Georgetown, South Carolina, arose as a result of an accident which occurred at the South Island Ferry in Georgetown, South Carolina, on December 11, 1977. Charles Lonnie Faust, the decedent, Tommy Bennett and Curtis L. Muldrow had been fishing in the waters of Winyah Bay and were attempting to return to the landing from which they had launched their boat when they collided with the guide cable of the South Island Ferry. The collision caused the death of decedent Faust and personal injuries to Bennett and Muldrow. Following the collision the plaintiffs brought these actions against the South Carolina State Highway Department, now known as the South Carolina Department of Highways and Public Transportation, the owner and operator of the ferry, and the United States of America as joint tort feasors. The defendants answered denying liability and at the same time asserting cross-claims against each other for contribution and counterclaims against the estate of the owner and operator of the boat, Charles Lonnie Faust. Having heard the testimony, studied the exhibits, and having fully reviewed all the evidence, the court makes the following findings of fact and conclusions of law:

## I—FINDINGS OF FACT

### A. *Background*

1. Prior to 1900, as part of the construction of the Intracoastal Waterway in Georgetown County, the United States Corps of Engineers (hereinafter referred to as "Corps") dug a canal from Winyah Bay to the Santee Delta. This canal, known as the Estherville-Minim Canal, runs generally in a north-south direction and separates South Island from the rest of Georgetown County. After construction of the canal, access from the mainland to South Island was afforded by the construction of a wooden bridge which has long since been destroyed. Thereafter, beginning approximately in 1920, access to South Island was available by ferry provided by Georgetown County, said ferry being located one (1) mile from the waters of Winyah Bay.

2. In 1940, the South Carolina General Assembly shifted the burden of and responsibility for the operation of the ferry from Georgetown County to the South Carolina Highway Department (hereinafter referred to as "Highway Department") with the passage of a statute, now embodied in § 57–15–140 of the 1976 Code of Laws of South Carolina, as amended, which incorporated the ferry and its approaches into the South Carolina Highway System as a portion of State Highway No. 716. The statute further directed the Highway Department to maintain and operate the ferry.

3. The Intracoastal Waterway is a part of the navigable waters of the United States and is a highway for barge and pleasure boat traffic. Since its construction, the Corps has dredged and maintained the waterway which is approximately 300 feet wide.

During its years of operation since 1940, the ferry operated at the South Island crossing has been a cable operated ferry. As an integral part of the cable operated ferry, there was a ⅝″ steel cable which was used as a guide cable to stabilize the ferry during crossings.

4. It appears that no known records are kept as to the number of boats that pass through this portion of the waterway during a given period of time; however, the majority of vessels are pleasure boats and tow vessels. Construction by Georgetown County of a boat landing adjacent to the ferry has resulted in a tremendous increase in traffic by local fishermen and other boaters in the area of the ferry within recent years.

5. From 1955 to 1975, approximately forty (40) accidents involving the ferry occurred. Most of the accidents were minor,

and most involved pleasure boats colliding with the guide cable. For the years 1971 to 1975, the South Carolina Department of Marine and Wildlife Resources investigated seven accidents involving collisions between boats and the guide cable, and forwarded the United States Coast Guard (hereinafter referred to as "Coast Guard") copies of their reports. The Coast Guard for that same period investigated five accidents (two of which were also investigated by the South Carolina Department of Marine and Wildlife Resources).

6. On October 9, 1974, John W. Fulton (hereinafter referred to as "Fulton") was killed, after nearly being decapitated, when his boat struck the guide cable for the South Island Ferry. The only other passenger in the boat, Carol Feaga (hereinafter referred to as "Feaga") was seriously injured. Fulton had been traveling from his home in Maryland south on the Intracoastal Waterway to Florida.

7. At the time of the October 1974 death of Fulton, the ferry warning system consisted of 4′ × 6′ signs upstream and downstream of the cable. The signs were on both sides of the channel and simply stated, "Caution-Ferry Crossing-.10 mile". The signs failed to inform boaters of the dangers posed by the cable when the ferry was in operation. Five red flashing lights were on the ferry boat, and a siren could be sounded by the operator from the island side. Use of the siren was not available once the ferry commenced a trip.

8. On November 21, 1974, Coast Guard Commander M. J. Stewart, the Marine Safety Officer responsible for the South Carolina Zone wrote District Engineer Catoe (hereinafter referred to as "Catoe"), who was responsible for all maintenance, construction and engineering activities in his district of the Highway Department and advised him of his concern for the hazards represented by the cable ferry crossing at South Island. He stated that the cable was the primary hazard and recommended some temporary modifications until such time as the cable could be removed. Among his recommendations were that the guide cable be modified so that it could be lowered to the bottom of the water from both sides of the waterway; that four (4) additional signs be installed with legends clearly indicating the danger of the cable and that passage should not be attempted while the lights on the ferry were flashing; that these signs should be located five hundred (500) feet north and south from the present signs; and that the guide cable be installed in a lower position that would likely result, if it were struck by a boat, in damage to the vessel's hull but less likelihood of injuries to individuals. He also recommended that the state should consider a self-propelled ferry or at least consider the use of a cable ferry without a guide cable and advised Catoe that ferries of this type were being operated by the State of Louisiana. He further suggested that Catoe contact officials in that state concerning the operation of such ferries.

9. On November 20, 1974, a letter of similar import had been sent by Commander Stewart to the Commander of the Seventh Coast Guard District in Miami, Florida, calling to his attention the dangers presented by the operation of the cable ferry and regarding changes similar to those made in his letter to Catoe.

10. On November 21, 1974, Catoe, by way of memorandum to the State Highway Engineer of the Highway Department, indicated that strobe lights were to be placed on both sides of the waterway to operate when the ferry was in operation and a switch was to be installed on the mainland side of the waterway to allow the guide cable to be lowered in case it was necessary due to an approaching boat.

11. On December 5, 1974, the State Highway Engineer by way of memo to Catoe approved, among other matters, the installation of the red strobe lights and the switch to allow the lowering of the guide cable from the mainland side of the waterway. Catoe was also instructed to comply with the terms of Commander Stewart's letter dated November 20, 1974, and to also give consideration to the recommendations contained in Commander Stewart's letter of November 21, 1974.

12. On October 9, 1975, suit was filed in the United States District Court, District of South Carolina, Charleston Division, by the Administrator of the estate of John W. Fulton and by Carol Feaga individually against the United States of America and the South Carolina State Highway Department for damages occasioned by the wrongful death of Fulton and for the injuries sustained by Feaga.

13. On April 1, 1977, the Honorable Sol Blatt, Jr., U. S. District Judge, after concluding the trial of the Fulton and Feaga cases wrote a letter to Paul W. Cobb, Chief Highway Commissioner of the Highway Department and advised him that he felt that the South Island Ferry, even after the addition of safety features which had been installed after the Fulton death, still constituted a dangerous hazard that was likely to result in further death and injury unless a safer crossing method was instituted. He also stated that he thought the situation as it existed at the South Island Ferry crossing was the most dangerous hazard to navigation that could be imagined.

14. On April 6, 1977, the Commander of the Seventh Coast Guard District located in Miami, Florida, wrote and advised the Marine Inspection Officer in Charleston, South Carolina, this being the same office previously commanded by Commander M. J. Stewart, that their office had been advised that the ferry was often carrying more passengers than permitted by law. In addition the letter advised the Marine Inspection Officer that the duties required of the ferry operator prevented him from keeping a proper lookout. The letter also pointed out that the additional signs requested by Commander Stewart in his letter to the Highway Department dated November 21, 1974, had not been installed.

15. On April 7, 1977, Paul W. Cobb, Chief Highway Commissioner, South Carolina State Highway Department, wrote a reply to Judge Sol Blatt, Jr.'s letter of April 1, 1977, in which he stated that he felt that all feasible safety suggestions relative to the operation of the South Island Ferry had been implemented by his department. He further indicated that he felt that there were four (4) alternatives available to his department regarding the South Island Ferry. These alternatives were: (1) continue operation of the present ferry with the resulting liability that may be involved; (2) change the present ferry operation to a self-propelled type which would involve a substantial expenditure; (3) construct a bridge for which the Department had no funding or (4) discontinue the ferry operation.

16. On May 16, 1977, the Coast Guard by letter advised Catoe that the operators of the ferry were required by law to maintain a proper lookout during the operation of the ferry and suggested that the ferry operators be furnished a flashlight so that they might be in a position to warn approaching vessels of the cable by being able to illuminate the same.

17. On August 17, 1977, the Corps concluded that it had responsibilities concerning the operation of the South Island Ferry and that the Corps possessed the authority to control the operation of a cable ferry in navigable waters. The circumstances causing the Corps to reach this conclusion began during the trial of the actions on behalf of Fulton and Feaga during the month of March, 1977.

18. On August 17, 1977, the Acting District Engineer for the Corps based in Atlanta, Georgia, by memorandum advised the District Engineer of the Corps based in Charleston, South Carolina, that ferry cables were subject to regulation by the Corps, citing appropriate legal authorities. In addition the memorandum alluded to the fact that the cable had been found to be dangerous and a hazard to navigation by a Federal District Court and if voluntary removal could not be accomplished the District Office of the Corps in Charleston, South Carolina, was instructed to commence appropriate legal action consistent with the Federal Court ruling.

19. On September 8, 1977, Col. William W. Brown, District Engineer, Army Corps of Engineers, wrote the Highway Department setting forth the Corps's concern re-

garding the safety of the South Island Ferry operation. The same letter also requested a meeting of representatives from the Highway Department, Coast Guard and South Carolina Wildlife and Marine Resources Department. The stated purpose of the meeting was for the formulation of a course of action to abate the hazard existing at the South Island Ferry. At this meeting on October 14, 1977, which was attended by representatives of all requested departments, it was stated by the Corps's representative that the ferry was hazardous and that it was only a matter of time before the Corps would have to close it down.

20. On October 18, 1977, the Highway Department acknowledged by way of memorandum that the average number of vehicles per day using the South Island Ferry from October 1976 through September 1977 was 49.6.

21. On October 23, 1977, there was an accident involving the South Island Ferry cable which resulted in injuries to three (3) persons.

22. On October 28, 1977, the Corps, citing the Rivers and Harbors Act of 1899 as its authority, by way of telegram, directed the Highway Department to minimize the number of ferry crossings by allowing crossings only for the compelling needs of the South Island residents and State, local and Federal authorities in the performance of their duties.

23. On November 3, 1977, another meeting was held between representatives of the Corps, Highway Department, Coast Guard and other interested parties. The meeting ended with the parties agreeing to work towards the elimination of the cable used in the operation of the South Island Ferry.

24. On November 17, 1977, the Highway Department sought approval from the Corps for a ferry schedule which would result in a twenty-five (25%) per cent reduction in the daily number of crossings.

25. On November 18, 1977, the Honorable Sol Blatt, Jr. issued his Order in *Doyle v. United States*, 441 F.Supp. 701, the cases determining the damages arising out of the death of Fulton and out of the injuries to Feaga. The *Doyle* decision found that the Corps and the Coast Guard were negligent and had abused their discretion in failing to warn boaters of the dangers that existed at the South Island Ferry and in failing to improve the safety of the ferry operation. The decision further held that their conduct was a proximate cause of the collision between Fulton's boat and the ferry cable which resulted in his death and the injuries to Feaga.

26. On November 22, 1977, the Corps by letter advised the Highway Department that the proposed reduced schedule of ferry crossings was unacceptable. Furthermore, the letter stated that the ferry was to be used as little as possible and to serve the needs of South Island residents *only*. (Emphasis in original). The Highway Department was also directed to furnish plans by December 2, 1977, to the Corps for the complete removal of the cable ferry. Also, on December 2, 1977, an approved minimal operation schedule was to be in effect.

27. On December 1, 1977, the Highway Department by letter to the Corps confirmed the extension deadline for plans to be formulated for a permanent solution to the South Island Ferry problem from December 2, 1977 to December 5, 1977. The letter further stated that plans were contemplated for a permanent solution and the Highway Department contemplated the taking of prompt action in regards to a permanent solution.

28. On December 1, 1977, the Highway Department advised the Corps by letter to District Engineer Col. William W. Brown that flagmen would be posted in boats upstream and downstream during the hours of operation of the South Island Ferry. The Highway Department stated these boats would be equipped with flashing lights and electronic public address systems to be used to warn traffic that the ferry was in operation.

29. On December 9, 1977, the Corps by letter of Col. William W. Brown, District Engineer, to the Highway Department, con-

firmed and approved the schedule of operation as previously submitted by the Highway Department and the use and posting of flagmen as outlined in the Highway Department's letter of December 1, 1977. This same letter went on to reiterate the serious concern of the Corps concerning the matter and urged the Highway Department to secure an early removal of the cable.

30. On December 11, 1977, Charles Lonnie Faust (hereinafter referred to as "Faust") was killed when he was struck by the South Island Ferry cable when passing the ferry in his motorboat. On that same date, two passengers in the boat, Tommy Bennett (hereinafter referred to as "Bennett") and Curtis L. Muldrow (hereinafter referred to as "Muldrow") sustained personal injuries as a result of the collision.

31. On December 12, 1977, the day after Faust was killed, the Highway Department's District Engineer was authorized to hire flagmen to operate the advance warning flag boats at the South Island Ferry.

32. Subsequent to December 11, 1977, Highway Department personnel began corresponding with representatives of an engineering firm in connection with the design of a self-propelled ferry. Specifications for the self-propelled ferry were completed in January of 1978 and a bid was let for the construction of the ferry in February of 1978. The self-propelled ferry was put into operation at South Island in April of 1978 at a cost of approximately $100,000. The total cost of the self-propelled motorized ferry was paid for by the Highway Department out of funds that were on hand prior to December 11, 1977. All of the matters relating to the self-propelled ferry were accomplished by the Highway Department in less than five (5) months after the death of Faust.

B. *The Ferry And Its Approaches on December 11, 1977*

33. The cable ferry in use on December 11, 1977 was operated identically to and was the same ferry, subject to certain modifications, that was in service on October 9, 1974, the date Fulton was killed when his craft struck the ferry cable.

34. The ferry was capable of transporting two (2) automobiles across the waterway. The water, over which the ferry moved, was subject to the ebb and flow of the tide.

The ferry, as it had been for many years prior to 1974, was stabilized by a ⅝″ steel guide cable which was permanently attached to both sides of the waterway. The ferry was manned by only one (1) operator, and when a crossing was necessary, the operator activated an engine located on the "hill" or high ground on the South Island side of the waterway. The activation of the engine, which was located directly behind the ferry mooring, caused the guide cable to become taut and rise to a horizontal position up to four (4) feet above the water across the entire width of the waterway.

The ferry was fifty (50) feet long, twenty (20) feet wide and weighed some twenty (20) tons. It was propelled by the use of a cable propulsion system which employed an eight horsepower engine to activate a double drum, which in turn pulled the ferry back and forth across the waterway. When the ferry was not in use, its regular station was on the South Island side of the waterway.

The operator's cabin was a wooden structure located in the center and off to the righthand side of the ferry as one viewed it from the mainland side of the waterway. This cabin contained, among other things, a manual throttle for activating the engine. Because of this it was necessary for the operator to remain inside the cabin at all times during the crossing of the waterway.

As the ferry moved from the South Island side to the mainland side of the waterway and from the mainland side to the South Island side of the waterway, the ⅝″ steel cable used to stabilize the ferry remained taut and up to four (4) feet across the entire width of the waterway. This cable also remained in the exact same position across the entire width of the waterway at all times while the ferry was moored

on the mainland side for the purpose of loading and unloading vehicles. Only upon the return of the ferry to its mooring on the South Island side of the waterway could the guide cable be lowered below the water to allow safe passage of boats.

The guide cable, because of constant exposure to salt water and other elements, was a muddy brown color. It was not capable of being seen at night. Although it would appear to an approaching boater that there was ample water behind the ferry for a vessel to proceed when the ferry was docked on the mainland side, passage was not possible due to the fact that the guide cable was taut and stretched across the entire width of the waterway.

On a typical trip the guide cable was taut up to four (4) feet above the waterway for a period of time of approximately eight (8) to fifteen (15) minutes.

35. The ferry made approximately thirty (30) crossings per day. A crossing consisted of the time necessary for the operator to activate the engine, to load the vehicles if necessary on the South Island side of the waterway, to cross the waterway, unload the vehicles on the mainland side, and return to South Island. The average crossing time from start to finish lasted from eight (8) to fifteen (15) minutes meaning that the waterway was subject to being completely blocked for up to 7.5 hours per day.

36. The markings and warning systems present at the ferry site on December 11, 1977 had changed somewhat since the Fulton death in 1974. The changes were made piecemeal by the various agencies involved and were often made only after there had been an accident between a vessel and the cable.

The so-called advance warning system on December 11, 1977, consisted of four (4) signs which were in actuality twelve (12) signs placed in groups of three (3) per pole in four separate locations. The poles upon which these signs were attached were located on both sides of the waterway with two (2) of them being five hundred (500) feet north of the ferry and two (2) of them being five hundred (500) feet south of the ferry.

The signs and the messages contained therein were identical at all four (4) locations; however, the coloring of the signs, the lettering of the signs and the size of the lettering on the signs varied.

The sign at the top portion of the poles was a 5 m.p.h. speed sign which was approximately 3′ × 4′. The legend was white letters and numbers on a red background. Located beneath the speed sign was a sign approximately 5′ × 12′ which contained on the top portion the word "CAUTION". The color was black letters on a red background. Located below the word "CAUTION" was a message "CABLE OPERATED FERRY 500–FEET AHEAD". This portion of the sign consisted of black letters on a white background. Located just below as part of the same sign was a further message which read "STOP ON RED". This lettering was black on a red background. In addition, there was a smaller sign approximately 2′ × 9′ located beneath the 5′ × 12′ sign which read "CABLE ABOVE WATER WHEN FERRY IN OPERATION". This sign consisted of black lettering on a white background.

Each of the four (4) sign locations were designed so that they were perpendicular to the waterway and the front portion was lighted by two spotlights which remained in operation after dark. In addition, all four (4) sign locations had two (2) red flashing wig-wag lights which were caused to be operational when the ferry was in operation. The two (2) sign locations on the South Island side of the waterway, both North and South of the ferry crossing, had, in addition to the signs and lighting described above, two (2) sirens on the top of the 5′ × 12′ sign which were activated during the time that the ferry was in operation. In addition, the two (2) sign locations on the South Island side of the waterway each had a red strobe light located adjacent to the sirens on the 5′ × 12′ sign. The strobe lights were also activated when the ferry was in operation.

The ferry itself had mounted on it five (5) revolving red lights similar to those used on

police and fire vehicles. In addition, there was one (1) red strobe light located atop the 16′ mast which was located on the ferry and there was one (1) battery operated siren aboard the ferry. These lights were activated while the ferry was in operation. The siren was activated manually by the operator during such time as he was located inside the operator's cabin. In addition, there were various reflective signs placed about the side of the ferry.

The cable itself was marked by stop signs which have been described as "trailing stop signs". This device consisted of two standard-size South Carolina Highway Department stop signs which were mounted in a wooden frame and located atop the guide cable just behind the ferry itself. The stop signs were not lighted in any manner and were not visible to persons using the waterway in the nighttime. The only difference in the markings on the ferry from 1974 until December 11, 1977, was the "trailing stop signs" and the fluorescent striped signs placed on the side of the vessel with the legend, "Cable Ferry-Stop on Red".

The operator was not furnished any equipment such as a flashlight or other devices with which to illuminate the cable at night. The operator because of the various duties required of him during crossings was unable to leave the cabin portion of the ferry and the siren located on the ferry was only capable of manual activation. Once the ferry reached the mainland side of the waterway and the operator was in the process of loading and unloading vehicles the siren was inoperative. The ferry landing areas, both on the island side and on the mainland side, were illuminated during periods of darkness with vapor mercury street lamps, such as are found in cities, designed primarily to assist in the loading and unloading of the ferry. These vapor arc lamps, the lights on the ferry, and the advance warning lights, are visible to a boater from the time he enters the Intracoastal Waterway from Winyah Bay.

37. Regardless of the various changes made at the ferry after the year 1974, the ferry remained a serious threat to life and property and continued to be the cause of numerous accidents on the waterway. The various signs located five hundred (500) feet North and South of the ferry crossing were confusing and misleading and failed to meet all of the guidelines for signs recognized and approved by the Highway Department and other persons with expertise in this area, including Coast Guard personnel. The signs were positioned in the waterway in such a manner that once the boater passed the signs it was impossible to read the message contained on the signs. In addition, the recognized engineering principle of one (1) sign to one (1) location was violated in that three (3) signs were placed in one (1) location. The signs did very little to apprise a boater unfamiliar with the area of the danger located at the crossing area. The danger itself, the steel cable stretched across the waterway, was insufficiently marked and in no way lighted and both the markings, consisting of the "trailing stop signs" and the cable itself were not capable of being seen in the nighttime.

In addition and more importantly, the revolving lights and the strobe light on the ferry itself served to attract a boater's attention to the ferry and away from the advance warning signs and the cable.

The messages contained at the advance warning sites, when grouped together as they were, five hundred (500) feet North and South of the ferry crossing, were misleading and confusing. The top sign indicated that the boater should travel 5 m.p.h. The middle sign indicated to the boater that there was a cable ferry operated ahead and that he should stop his boat on red but did not indicate where he should stop. The bottom sign indicated that there was a cable across the waterway when the ferry was in operation. This sign failed to tell the boater that when the ferry was on the mainland side and in the process of loading or unloading vehicles that it was still in operation although it was no longer traversing the waterway.

It would appear to a boater in the nighttime after his attention had been attracted

to the ferry by its flashing lights that a ferry located hard on the bank on the mainland side in the process of loading or unloading vehicles was no longer in operation and that the cable alluded to in the signs was no longer across the waterway.

The various colors used on the three (3) signs at each of the four (4) sign locations and the messages contained on the signs competed against one another for a boater's attention. In addition, the black lettering on the red background on the middle sign was not capable of being seen as easily as other portions of the sign by a boater in the nighttime. Although it is undisputed that the cable was a hazard and a danger to a boater using the waterway, none of the signs at any of the locations used the word "danger" when the use of such a word would have given a boater a clearer indication as to what existed in the waterway just five hundred (500) feet from the sign.

It is an accepted principle in the posting of signs that the greater the danger the greater the responsibility to mark the danger. There was nothing in the South Island area that would allow a boater at night, who was unfamiliar with the area, to visibly or otherwise ascertain the existence of a steel cable stretched across the waterway, inasmuch as the cable was in no way marked so as to be visible in the nighttime.

## C. *Accident And Injuries*

38. The deceased, Faust, and two of his friends, Bennett and Muldrow left Florence, South Carolina, during the morning part of December 11, 1977, for the purpose of fishing in Winyah Bay located near Georgetown, South Carolina.

The three (3) men arrived in the City of Georgetown just before noon and after purchasing bait and getting directions to a landing they launched their craft, which was an eighteen (18) foot West-Bend inboard/outboard motorboat owned by Faust, shortly after noon. The boat was launched from a public boat landing located in the City of Georgetown.

All of the men were unfamiliar with the Winyah Bay area. Faust and Bennett had been in the area once before; however, their fishing on that occasion was done from an abandoned bridge. None of the men had ever done any boating in salt water.

Shortly after leaving the landing the men came upon a disabled boat occupied by Henry H. Hendricks (hereinafter referred to as "Hendricks"), a resident of the Georgetown area. There was a conversation concerning the trouble with his boat and then a later conversation concerning fishing conditions in the area. After a short period of time Hendricks agreed to join the men in their boat and to take them to an area where they might be able to catch some fish. The men then traveled to an area near Debordieu Beach and fished during the afternoon. After completing the fishing they then went to an area to gather oysters and then went back to crab pots owned by Hendricks and removed some crabs. As darkness approached they headed back to the area where Hendricks had left his boat and thereafter Faust towed the Hendricks boat to an area known as Campbell's Landing. Since darkness was fast approaching and the boaters were unfamiliar with the area they asked Hendricks for directions back to the landing. The men did not specify which landing they were seeking and inasmuch as the South Island landing was a popular public boat landing and since they had initially come from that direction, Hendricks incorrectly assumed that they had put in from South Island landing. He gave them directions back to South Island landing which was located in an area near Campbell's Landing.

39. Shortly after leaving Campbell's Landing, at approximately 6:10 P.M., the boat being piloted by Faust, exited from Winyah Bay as per the instructions of Hendricks and headed South down the Intracoastal Waterway, more particularly, the Estherville-Minim Creek Canal. It was in this canal that the South Island Ferry was located.

Once reaching the Intracoastal Waterway the boat was driven by Faust at a speed

between 15 and 25 m.p.h. Faust was positioned such that he was sitting on his feet with his head above the windshield. Immediately to his side was Bennett who was standing so that his head was also above the windshield. Muldrow was seated facing backwards in a seat located just behind Faust. The boat traveled in the middle of the waterway as it approached the area in which the cable ferry was located.

As the Faust boat approached the cable ferry, the ferry was hard on the mainland side and the operator was in the process of unloading an automobile at the time of the accident. The guide cable was taut and spanned the complete width of the canal which was approximately three hundred (300) feet. The lights were in operation on the ferry itself and the sign locations five hundred (500) feet North and South of the cable crossing were illuminated. The sirens at the sign locations were activated; however, they were incapable of being heard from a boat traveling at the speed the Faust boat was traveling. The siren on the ferry, which was previously sounded by the operator during the crossing, was no longer operational since the ferry had completed the crossing and the operator had exited the operator's cabin and was removing a chain to allow an automobile to leave the ferry. Although the operator ran from his position on the mainland to the ferry cabin in order to manually sound the siren located on the ferry, the testimony is that the sounding of the siren and the collision itself were simultaneous.

The tide at the time was rising and would have been high at approximately 9:30 P.M. The weather was cold and it was dark and clear at the time of the collision.

Regardless of the speed of the Faust boat, and the testimony concerning the speed varying from 15 m.p.h. to 25 m.p.h., the occupants of the boat would only have had a matter of seconds within which to read, interpret, comprehend, and obey the messages located on the advance sign locations. After passing the sign locations, the collision with the cable would have occurred within a matter of seconds.

39. The passenger, Muldrow, seated facing the rear of the boat, did not see any of the advanced signs nor did he see the ferry nor hear any sirens until the time of the collision. The passenger, Bennett, saw what he describes as a blur of light which occurred just prior to the collision. The speed of the boat did not vary nor did the boat veer from its course down the center of the waterway from the time it entered the waterway until the time it struck the cable. There is no evidence that Faust ever saw the cable stretched taut across the waterway behind the ferry.

40. At the time of the impact the bow of the boat passed under the cable which would have been an approximate height of four (4) feet. The cable struck the windshield of the boat and Bennett, who had been standing next to Faust, was thrown from the boat. Faust was hurled backwards and down onto the bottom of the boat suffering severe neck and head injuries resulting in his immediate death. Muldrow was thrown about in the boat.

41. Faust endured no pain and suffering prior to death. At the time of his death on December 11, 1977, Faust was forty (40) years of age and had an additional 34.05 years of life expectancy and a work-life expectancy of 23.05 years. He was survived by four (4) dependents, his wife, age 37 at the time of his death, and three minor children, ages 5½, 8½ and 11½ at the time of his death. Faust enjoyed a loving family relationship with his wife and children. He was graduated from Voorhees College, South Carolina State College and received additional training from Denmark Technical Education Center, Florence-Darlington Technical Education Center and Francis Marion College. At the time of his death he held a Master's degree in the field of teaching and had been employed by the Florence Public School District One as a teacher for a number of years.

At the trial of this matter the plaintiff, Faust, and the defendant, United States of America, both presented economic experts as to the financial losses incurred as a result of the death of Faust. Both experts testi-

fied from a series of charts, graphs and work figures that they had compiled and these were received by the Court and have been examined in detail. Both of the experts confined their testimony and findings to the loss of financial contributions and home services resulting from the death of Faust. I find that the approach and figures used by the plaintiff's expert witness, namely, Dr. Oliver G. Wood, Jr., is a more practical approach to the problem and adopt his findings as to the economic loss suffered by the Faust family. The Court would note that the discount rate and the method of computing the present value of the total financial loss used by Dr. Oliver G. Wood, Jr. has been used and accepted by the United States District Courts. *Doyle v. United States*, 441 F.Supp. 701 (D.S.C.1977).

■ Faust, who was age 40 at the time of his death, had an additional work-life expectancy of 23.05 years. Dr. Oliver G. Wood, Jr., Ph.D., an actuarial expert, has opined that the before trial loss in gross earnings which includes the period from the date of the death until the trial is $64,404. Upon reducing his earning capacity to adjust for his contribution to the retirement system, taxes and personal consumption, the before trial loss in net earnings is $34,752. The opinion of the expert was that the present value of the after-trial loss and net earning capacity, as well as retirement income, is $194,360. This figure includes adjustment for retirement contributions, taxes and personal consumption.

Furthermore, Faust spent a minimum of ten (10) hours per week providing numerous domestic services for his family, including but not limited to: caring for the lawn, upkeep on the house, repairing and maintaining the family automobile and home appliances, providing transportation for the children, and financial management for family affairs. Valuing these services at the federal minimum wage rate plus the employer Social Security payments in the after-trial period results in a pre-trial loss in family services amounting to $6,091.

Similarly, the computation for the after-trial loss of family services computed to $52,643.

The total before and after-trial loss by virtue of loss of earning capacity and family services reduced to their present value as computed from the figures set forth above totals $287,846.

In addition, Faust's combined funeral expenses representing an out-of-pocket expense to the Faust family totals $2,481.00, bringing the total economic loss to $290,327.

■ Faust was a devoted and loving father and husband. He returned to his home promptly after completion of his workday at the high school and upon reaching home spent his time with his wife and in particular the three young children in the home. The wife and children were included on weekend activities which, among other things, consisted of visits to various family members located within the state. He was active in his church with his family and served in a number of capacities dealing with church work. He also conducted family devotions in the home which among other things consisted of a frequent reading from the Bible. He assisted his children with their homework, played games with them, took them on family picnics and outings, took them fishing and counseled with them concerning their everyday problems. A majority of his non-working time was spent with his wife and children and a great deal of that time was spent nurturing, training, educating and guiding his three (3) young children. As a result of his wrongful death, they have been deprived of these services. I am of the opinion that the children are entitled to recover for this loss. In evaluating these services, they do not lend themselves to mathematical exactness. It is, however, my opinion that One Thousand Five Hundred and NO/100 ($1,500.00) Dollars per year per child until each child reaches age twenty-five (25) [1] should be recovered for each surviving child for this loss. This item, calculated for all three (3)

---

1. In my opinion, children rely on their fathers for nurture, guidance and training until at least

twenty-five (25) years and in many instances throughout their parents' lives.

children, is Fifty-Eight Thousand Seven Hundred Forty-Two and NO/100 ($58,-742.00) Dollars.[2]

During the entire course of the marriage Faust provided his wife and children with love and affection, and in addition, provided care, attention, companionship, comfort and protection for them. The deprivation of these "society" benefits by his wrongful death has resulted in a grave loss to her and the three (3) children.

Faust and his wife were a close and loving couple and the marriage had never been subject to any periods of separation and at the present time Mrs. Faust is unmarried and has been so since the date of her husband's death.

 In my opinion each child is entitled to an award which I find to be Thirty Thousand and NO/100 ($30,000.00) Dollars per child for a total of Ninety Thousand and NO/100 ($90,000.00) Dollars for the three (3) children, for this loss of companionship; and I am of the opinion that the widow, Alean Hester Faust, is entitled to an award of Sixty Thousand and NO/100 ($60,000.00) Dollars for such loss. Therefore, plaintiff is entitled to recover, both on her behalf as widow and on behalf of her children, the sum of One Hundred Fifty Thousand and NO/100 ($150,000.00) Dollars.

42. At and prior to the collision between the Faust boat and the taut cable, the plaintiff Curtis L. Muldrow was seated in the rear of the boat facing aft behind the driver. On impact Muldrow was rendered unconscious. After the boat passed under the cable and began circling in the waterway, Muldrow regained consciousness, staggered to the front of the boat and turned the throttle off. Some boatsmen in another boat came alongside and carried him to the landing on the mainland side where he stayed in the cab of a truck to keep warm until the ambulance arrived in about a half hour. He and his injured companion, Thomas Bennett, were transported by ambulance to the Georgetown Memorial Hospital for treatment of their injuries. Later that evening, following x-rays, Muldrow was released and returned to his home in Florence.

On December 12, 1977, he awoke in pain and was examined by his physician, S. A. Greenberg, M.D., who diagnosed his injuries as a cerebral concussion, multiple contusions of the head and shoulders, cervical and thoracic sprain, a subconjunctival hemorrhage of the right eye, depressive reaction, with post-concussion syndrome. The following day he was admitted to the Florence General Hospital for x-rays, physiotherapy and treatment and released on December 19, 1977. He continued under Dr. Greenberg's care on follow-up visits for headaches and pain and distress in the cervical and lower back until March 30, 1978. Due to persistent headaches he was referred for neurological evaluation of the post-traumatic headaches to Dr. S. C. Soni, M.D., at the Medical University of South Carolina Hospital, Charleston, South Carolina, on April 5, 1978, and received a negative neurological report.

On May 3, 1978, due to persistent headaches and pain in the cervical area of his spinal column, he was examined and x-rayed by an orthopedic specialist, A. Cecil Bozard, M.D., Florence, South Carolina, which disclosed a displaced fracture of the tip of the spinous process of the second cervical vertebra. A home traction device was prescribed, along with a Jackson pillow to support the weight of his head and neck during sleep. He was seen on follow-up visits and discharged on May 11, 1978, as being incapable of returning to work, and having the potentiality of permanent cervi-

2. Antonious, 5½ years old, is entitled to recover for a total of 19.5 years as follows: 4 years pre-trial recovery of $6,000 and 15.5 years after-trial recovery, discounted at the rate of 5%, of $15,917.00, for a total of $21,917.00.

Shongra, 8½ years old, is entitled to recover for a total of 16.5 years as follows: 4 years pre-trial recovery of $6,000 and 12.5 years af-ter-trial recovery, discounted at the rate of 5%, of $13,697.00, for a total of $19,697.00.

Darlean, 11½ years old, is entitled to recover for a total of 13.5 years as follows: 4 years pre-trial recovery of $6,000 and 9.5 years after-trial recovery, discounted at the rate of 5%, of $11,128.00, for a total of $17,128.00.

cal disc injury. A lumbar corset or support was prescribed for his lower back distress.

On August 28, 1980, he was evaluated orthopedically by Edward E. Kimbrough, M.D. of the Moore Clinic, in Columbia, South Carolina. X-rays revealed an old displaced avulsion fracture of the tip of the spinous process of C–2 vertebra and a spondylolysis of the 5th lumbar vertebra. Due to continued symptoms of neck pain and some low back pain, Muldrow was rated at having a 20% permanent impairment of the cervical spine and a 10% impairment of the lumbar spine as a result of injuries sustained in the accident.

On November 13, 1981, Muldrow was given an up-to-date orthopedic evaluation by Harry C. Taylor, M.D., Georgetown, South Carolina, who rated Muldrow as having sustained a 20% permanent disability of the cervical spine and a 25% permanent disability of the lumbar sacral spine, in view of current symptoms despite the lapse of time.

At the time of the accident Muldrow was 26 years old, was working as a debit insurance agent with Interstate Life Insurance Company, Florence, South Carolina, and earning $1,200 a month, base pay plus commission. He was unable to return to work until January, 1978; however, upon his return he could not perform his debit work which required driving a car and getting in and out of the vehicle. He continued his work in the office with no loss of pay, until he resigned in March, 1978, because of his inability to do the work due to headaches and dizziness; thereafter, he sought relief from his physician.

Prior to entering the life insurance business, Muldrow was a mechanic by trade. He attempted to return to work as an automobile mechanic, but could not do so on account of his injuries. Since November of 1978 he has been working parttime as a mechanic and truck driver making $400 a month. In addition, he is unable to resume his previously enjoyed athletic activities. His medical expenses, exclusive of his hospitalization in the Florence Memorial Hospital, the amount of which no evidence was presented, amounted to $340.

■ Muldrow sustained painful injuries in the accident consisting of a cerebral concussion, multiple bruises and contusions, cervical and thoracic sprains, conjunctival hemorrhage of the right eye, a fracture of the spinous process of C–2 vertebra, a severe lumbo sacral sprain and right sciatic neuritis. The cervical and lumbar symptoms have persisted and he has sustained a 20% permanent partial disability of the cervical spine and a 25% permanent partial disability of the lumbo sacral spine, which has affected his ability to perform heavy work or the usual duties of an automobile mechanic such as lifting, working under motor vehicles, or other physical motions, as he was able to do prior to the accident without difficulty. I find that he is entitled to be properly compensated for his pain, suffering, damages and permanent partial disability, before and after trial, and taking into consideration future pain and suffering and discomfort, and reducing that amount to its present cash value by use of a discount rate of five (5%) percent, which this court feels is reasonable and fair, in the sum of Eighteen Thousand and NO/100 ($18,000.00) Dollars.

■ 43. At and prior to the collision between the motorboat and the taut cable, the plaintiff Thomas Bennett, age 34, was standing in the front of the boat behind the windshield facing forward and to the left of the driver. On impact the windshield was shattered and Bennett was struck in the chest by the cable and was thrown overboard. Some boatsmen in another boat rescued him when he came to the surface and he was carried to the landing on the mainland side of the waterway, where he stayed in the cab of a truck to keep warm until an ambulance arrived in about a half hour. He and his companion, Curtis L. Muldrow, were transported by ambulance to the Georgetown Memorial Hospital for treatment of their injuries. Later that evening following x-rays, Bennett was released and returned to his home in Florence, South Carolina.

On December 12, 1977, he awoke in great pain and was examined by his physician, R. L. Skinner, Jr., M.D., who diagnosed his injuries as contusions of the anterior chest wall and a costocondral separation of his chest or rib cage below his neck. He was prescribed drugs for pain and was unable to return to work until January 15, 1978, due to his injuries. At the time of the accident he was performing heavy work, which required the use of his arms, shoulders and back and strain on his chest and rib cage at the Electro-Motive Plant in Florence, where he grossed $500 a month on the day shift. At the time of the accident he was also working and performing heavy labor at the La-Z-Boy Chair plant in Florence, where he grossed $500 a month on the night shift. He continued under the care of Dr. Skinner until January 11, 1978, when he was discharged without any disabling symptoms. His medical expenses for treatment at Georgetown Memorial Hospital, $77.00, x-rays at McLeod Memorial Hospital, $41.00, amounted to $170.00. On November 13, 1981, Bennett was examined by Harry C. Taylor, M.D., Georgetown, South Carolina, at which current examination Dr. Taylor found that he had fully recovered from his injuries with no disability or permanent impairment.

Bennett sustained a painful injury of his separated rib cage, which temporarily disabled him for a period of five weeks from engaging in his customary or normal activities and performing his job and loss of wages for that period of time. I find that he is entitled to be properly compensated for his pain, suffering, damages and temporary total disability in the sum of Five Thousand and NO/100 ($5,000.00) Dollars as a result of the accident.

## D. *Responsibility and Fault*

44. During its years of operation, the South Island Ferry has been subject to statutes, rules, regulations and guidelines set forth by the United States of America and the State of South Carolina. These have been implemented by various agencies of the United States of America and the State of South Carolina. The degree of involvement by these two entities has varied from time to time but since the year 1974 both have become active in their involvement with the South Island Ferry and in particular with the safety aspects surrounding the operation of the ferry. ·

Both entities have had full knowledge of the many accidents involved at the ferry crossing site and all were particularly aware of the 1974 accident which resulted in the death of Fulton.

Both the Highway Department and the United States of America were sued in the United States Federal District Court concerning the Fulton death.

The Highway Department has been actively engaged in the operation of the South Island Ferry since the incorporation of that ferry site into the South Carolina Highway system in the year 1940. The Highway Department during the years 1971 to 1975 investigated at least seven accidents involving collisions between boat and the cable and forwarded copies of their reports to the Coast Guard, an agency of the United States of America.

The Highway Department by letter of November 21, 1974, shortly after the Fulton death, was put on notice of the Coast Guard's concern for the hazards presented by the cable and were advised that the cable should be modified so as to be lowered from both sides of the waterway and that four (4) additional signs with legends clearly indicating the danger of the cable should be erected. Neither of these directives were complied with by the Highway Department nor was there any effort as requested by the Coast Guard to lower the guide cable's position above the waterway so as to cause less likelihood of injuries to individuals.

At the completion of the trial of the case involving the death of Fulton, the Chief Highway Commissioner received a letter dated April 1, 1977, from the Honorable Sol Blatt, Jr., trier of the facts in the matter involving the death of Fulton, who advised that even after the additional safety features had been added the ferry crossing

constituted a dangerous hazard and was likely to result in further death and injury. In replying to this letter, the Chief Highway Commissioner set forth a number of alternatives available to the Highway Department and among those was the decision to "continue operation of the present ferry, with the resulting liability that might be involved."

After the Corps decided that it had an area of responsibility in this matter the Highway Department was advised on October 14, 1977, that corrective measures had to be taken or the Corps would close the ferry down. Again nothing was done by the Highway Department until an additional accident took place on October 23, 1977.

Five (5) days after that accident the Highway Department was advised to minimize its crossings as directed by a telegram of the Corps forwarded to the Chief Highway Commissioner. Nothing was done to comply with this directive by the Highway Department.

Although the Highway Department indicated during the latter part of the year 1977 that warning boats would be placed in the area with public address systems to be used to warn approaching boaters of the danger, nothing was done in this regard prior to December 11, 1977.

There were some changes made by the Highway Department to add extra signs concerning the presence and danger of the ferry crossing and there were some additional sirens and flashing lights added at the signs posted five hundred (500) feet North and South of the cable crossing and while these may have been some improvements lessening the dangers existing at the site, they were obviously insufficient. The signs as they existed on December 11, 1977, were confusing and misleading. The signs did not comply with the five (5) elements recognized by engineers in this field necessary to adequately mark a hazard or danger. These elements were recognized as the controlling elements in this area by the expert witness offered at trial by the Coast Guard. In addition, these elements are set forth in the South Carolina Highway Department manual used by their engineers for the designing, placement and erection of signs within the State of South Carolina.

The signs were insufficient to meet the required need due to the danger that existed and incorrectly attracted the attention away from the real hazard, the cable stretched across the waterway. The signs were not simple in their meanings and were not designed to gain the respect of the reader. In addition, the signs were placed so that a boater did not have adequate time within which to respond to the message printed on the signs. In addition, the messages on the signs were misleading and confusing and incapable of being adequately seen due to improper lettering, coloring and markings.

Even though the Highway Department knew and had been advised on numerous occasions by the Corps and the Coast Guard that the cable itself was the hazard, they failed to properly mark the cable and their failure to do so, combined with their failure to properly mark the area, clearly shows a callous disregard for human life.

The continuing failure of the Highway Department to remove the cable after approximately forty (40) accidents involving the ferry and individuals between the year 1965 and 1975, including the death of Fulton in 1974, shows a clear indication of its failure to take sufficient steps to remove what was described by the Honorable Sol Blatt, Jr. as "the most dangerous hazard to navigation that can be imagined."

The Highway Department could have merely lowered the cable as directed by the Coast Guard which would have probably prevented the death of Faust and the injuries to Bennett and Muldrow. Similarly, had they put into operation the use of the boats with the public address warning systems as they stated they had done to the Corps, the likelihood of Faust's death and the injuries to Bennett and Muldrow would have been substantially diminished.

The Highway Department in its efforts to mark the site in lieu of marking the hazard itself, i.e. the cable, only added con-

fusion to the matter. The lights as they were placed at the sign locations and atop the ferry competed with one another for attention and the lights on the ferry drew a boater's attention to that vessel and away from the warning signs and the hazard itself, the cable. The number and placement of the lights resulted in what has been described as a "maze" of lights.

The Highway Department on a number of occasions was directed by the Corps to revise the operational hours of the ferry and to put a limitation on the use of the ferry. The Corps first directed on October 28, 1977, that the operation of the ferry was to be restricted to the compelling needs of the South Island residents and those county, state and federal government personnel whose presence on the island was necessary for the performance of their duties. This directive was not heeded by the Highway Department. On November 22, 1977, the Corps directed the Highway Department to schedule minimal operation of the ferry to serve the needs of the South Island residents only. This was not done by the Highway Department. Either of these restrictive uses of the ferry would have resulted in the waterway being blocked for shorter periods of time. At the time of the death of Faust and the injuries to Bennett and Muldrow, the ferry was being used by anyone who presented himself to the operator and, in fact, there were non-residents on the island at the time of the collision who had been hunting on the island and who were waiting to return to the mainland side.

The Highway Department had full knowledge of the danger that existed and it appears that it had adequate funding and know-how to solve the problem. This is evidenced by the fact that a self-propelled non-cable ferry was designed, built, and put into operation within five (5) months after the initial inquiry about such a craft was made by the Highway Department during the latter part of December, 1977. It is also of importance that the money used to fund the self-propelled ferry was available and on hand during the budget year of 1977 and a special appropriation was not necessary in order to fund this change.

The failure of the Highway Department to have implemented any plans prior to the death of Faust and injuries to Bennett and Muldrow for removing the cable and the continued failure of the Highway Department to follow directives issued to it by the United States of America concerning the safety of the cable crossing and the ultimate removal of the cable was negligence and contributed to the proximate cause of the death of Faust and the injuries to Bennett and Muldrow.

45. Although the United States of America had nothing to do with the ownership or maintenance of the ferry itself, this entity was certainly charged by law with various responsibilities and duties concerning the cable ferry inasmuch as it operated in the navigable waterways of the United States of America. It is evident by their actions and conduct that the United States of America knew of the ferry's existence and of the hazards to navigation that it presented.

46. The Coast Guard personnel used the ferry on a regular basis. Coast Guard personnel as early as 1974 had corresponded with the Highway Department and directed that various safety measures be taken concerning the ferry and were specific in what action was to be taken. The recommendations, however, of the Coast Guard were clearly insufficient to mark the hazard that existed and nothing was done by the Coast Guard to follow up on the 1974 directives to establish whether or not these matters had been complied with by the Highway Department. Even internal memorandums from the Commander of the Seventh Coast Guard District to the local office located in Charleston concerning the implementation of directives to the Highway Department set forth as early as 1974 were ignored by the Coast Guard.

Although the Coast Guard was aware as early as 1974 that the only solution to this problem was a complete removal of the cable itself, the ferry was continuously allowed to be operated without proper mark-

ing of the cable hazard. Even though the Coast Guard received numerous accident reports concerning the ferry, they did nothing other than correspond with the Highway Department concerning this matter with the exception of the posting of a 5 m. p. h. speed zone sign in the area. The Coast Guard failed to comply with the prevailing engineering principles concerning the posting of speed limit signs. The sign as erected at the ferry site was placed in an unusual location and in such position that a boater would not expect a speed sign to be posted in this manner.

Although it is charged with the markings of obstructions in the waterway, the posting of aids to navigation, and the approval of private aids to navigation, the Coast Guard at no time followed up on its directives to the Highway Department to assure that the directives made by it to the Highway Department had been complied with and at no time took any steps to mark the steel cable, which was clearly a hazard and an obstruction to the waterway at the South Island Ferry crossing.

It is apparent from the testimony that the signs located at the ferry crossing site as well as the lights and other warning devices erected there were aids to navigation and, as such, subject to the approval and control of the Coast Guard. Because of their knowledge of the danger as it existed the Coast Guard should have undertaken to require the Highway Department to comply with their directives in erecting proper signs and warnings concerning the hazard. Upon the failure of the Highway Department to act, it was incumbent upon the Coast Guard to erect their own signs so as to adequately mark the hazard and give warning to the boating public of the danger that existed in the Intracoastal Waterway.

The inaction of the Coast Guard to properly mark the obstruction in navigable waterways, combined with their failure to determine if the same had been properly marked as per their directives to the owner of the obstruction, constituted an irresponsible error in judgment and was an abuse of discretion and negligence. This failure on the part of the Coast Guard was a proximate cause of the death of Faust and the injuries to Bennett and Muldrow.

47. The Corps, who has jurisdiction over the South Island Ferry crossing site and who is charged with the responsibility of removing obstructions to navigation in the navigable waterways of the United States of America, did nothing to exercise its authority to remove the existing hazard to the Intracoastal Waterway. The Corps was aware as early as 1974 that there was a serious question as to the agencies responsible for the safe operation of the South Island Ferry. Although it had this knowledge for a number of years, it appears that the Corps first began to explore their realm of responsibility only during the trial of the Fulton case in March of 1977. After some delay a determination was made in August of 1977 that it did have responsibilities and duties in this area. Only at this point did any member of the Corps take any steps towards improving the safety of the ferry and formulating a plan for the removal of the cable itself. Although a number of meetings were held, nothing was done by the Corps to exercise its authority to close the operation of the ferry until the hazard of the cable could be removed. In addition, although promises were made by the Highway Department concerning the addition of safety features to the area such as boaters with public address systems to warn approaching boaters, nothing was done by the Corps to determine that these safety features had been undertaken and, in fact, they had not been put into operation. This could have easily been determined by the Corps had it followed through on its responsibilities under law. In addition, although the Corps set deadlines for the Highway Department to produce plans which would result in the removal of the cable, the Corps took no action concerning its directives and deadlines when they went unheeded by Highway Department.

Although the Corps directed a limitation of the use of the ferry by its telegram of October 28, 1977, to the Highway Department and by its letter of November 22, 1977

to the Highway Department, the Corps never received any proper responses to these directives from the Highway Department. The Corps upon failure to receive proper response should have moved immediately to close the operation of the cable operated ferry at South Island.

In addition, when the Corps failed to receive definitive plans as to a permanent solution to the removal of the cable at South Island Ferry on December 5, 1977, it should have moved immediately to close the operation of the South Island Ferry crossing.

The only explanation proffered by the Corps concerning its inaction was that they regarded this matter a "sensitive area" inasmuch as a state entity was involved with the obstruction in the waterway. This treatment of the problem in this fashion caused an untimely delay on the part of the Corps in acting to assure the removal of the obstruction and the safe passage of boaters upon the Intracoastal Waterway.

This failure of the Corps to follow through on the directives issued to the State of South Carolina and the failure of the Corps to stop the complete operation of the ferry until the hazardous condition, i.e. the cable, was removed was an abuse of their discretion and constituted negligence on the part of the Corps both of which were proximate causes of the death of Faust and the injuries to Bennett and Muldrow.

48. The failure of the United States of America by its agencies, the United States Coast Guard and the U. S. Army Corps of Engineers, to exercise due care for the rights of the boating public when both agencies had full knowledge of the real dangers to navigation existing at the South Island Ferry was not only an irresponsible error in judgment but also an abuse of discretion and negligence. The failure of these agencies to act appropriately was a proximate cause of the Faust death.

49. In apportioning fault between the Highway Department and the United States, I find the parties to be equally at fault.

50. The speed and manner in which Faust operated his boat was prudent and reasonable under the circumstances and played no role in the causing of the accident. The passengers, Bennett and Muldrow, likewise conducted themselves in a reasonable and prudent manner and are not chargeable with any negligence or fault which contributed to the cause of the collision.

51. Faust was not an experienced boatsman in the operation of boats in salt water. He, like many others using this area, was a recreational boater concerned primarily with the use of his craft for pleasure. He did not have on board nor consult any up-to-date charts of the inland waterway system published by the United States Coast and Geodetic Survey. It does not appear that he had access to the government publication designated as Coast Pilot which contained certain information concerning the South Island site.

There was no requirement under Coast Guard regulations for a boat of this size to have on board charts nor any other navigational aids of a similar nature. It is not to be expected that pleasure boatsmen would ordinarily have such charts and information on board. The failure of Faust to have such information on board played no role in the causing of the accident.

52. Although there was testimony of consumption of alcohol by the occupants of the boat during the course of the day, there was no testimony that the alcohol consumed in any manner affected Faust nor the passengers nor in any way contributed to the accident. The testimony was overwhelming that Faust was in no way impaired as a result of his consumption of an alcoholic beverage and, in fact, the testimony was that his operation of the boat was consistent with that of a person who was not under the influence of alcohol.

Testimony was that the speech of Faust was not slurred or in any manner impaired nor was there any evidence of body impairment caused by the consumption of alcohol. It appears from the testimony that he,

while towing the Hendricks boat, piloted his vessel in a prudent and proper manner to a dock for unloading of the Hendricks boat; that he thereafter followed the directions given him by Hendricks to return to the landing. It appears that he turned at the proper marking in the channel as directed by Hendricks and that once his boat entered the Intracoastal Waterway it remained in the center of the channel at the same speed. The boat in no way veered nor were there any erratic movements of the boat to evidence it was being operated by a person under the influence of alcohol. Likewise, there was no testimony of any erratic behavior on the part of the persons in the boat at any time during the course of their day in and near Winyah Bay. Therefore, this court specifically finds that the consumption of any alcoholic beverage aboard the Faust boat was in no way the proximate cause or contributing proximate cause of the collision.

Based on the aforesaid findings, this Court has concluded that the cable ferry located at the South Island crossing on December 11, 1977, constituted an extremely dangerous trap to unwary boaters. The hazard and danger as it existed was evident to all persons and agencies familiar with its operation. The warning signs, lights and other devices were insufficient to apprise a boater of the danger which he faced when the cable ferry was in use.

## II—CONCLUSIONS OF LAW

A. *As to the Highway Department*

1. *Jurisdiction, Sovereign Immunity and the Eleventh Amendment*

Subject matter jurisdiction in this matter is found in 28 U.S.C.A. § 1333 which confers subject matter jurisdiction on the District Court over any civil case of admiralty or maritime jurisdiction. This Court, pursuant to 46 U.S.C.A. § 742, has venue of these matters.

Furthermore, the activity complained of resulting in the death of Faust and the injuries to Bennett and Muldrow have the proper maritime nexus and are appropriate-

ly brought under general maritime law. *See, Sea Land Services v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1973); *Moragne v. United States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1969); *Whittington v. Sewer Construction Co., Inc.*, 541 F.2d 427 (4th Cir. 1976).

It is uncontested that the Highway Department is an alter ego of the State of South Carolina; thus the question becomes whether the Highway Department is in this instance entitled to its Eleventh Amendment immunity or whether this immunity has been waived. The case of *Lauritzen v. Chesapeake Bay Bridge and Tunnel District*, 404 F.2d 1001 (4th Cir. 1968) relying upon *Parden v. Terminal R. Co. of Ala.*, 377 U.S. 184, 196, 84 S.Ct. 1207, 1215, 12 L.Ed.2d 233 (1964), *rehearing denied*, 377 U.S. 1010, 84 S.Ct. 1903, 12 L.Ed.2d 1057 (1964), establishes that when a state leaves the sphere that is exclusively its own and enters into activities that are subject to congressional regulation, the state subjects itself to that regulation as fully as if it were a private person or corporation. Under *Lauritzen*, it is well established in this circuit that a state waives its right to immunity and consents to suit if it knowingly and directly enters a field which is subject to the constitutional powers and regulations of the federal government. In the instant case, it is clear that the South Island Ferry was owned and operated by the Highway Department pursuant to a specific state statute, now embodied in section 57–15–140 of the 1976 Code of Laws of South Carolina, as amended, and that it operates on the Intracoastal Waterway, a navigable body of water subject to federal regulation. Clearly, the involvement of the Highway Department in regards to operation of the South Island Ferry satisfies the test of *Lauritzen* and *Parden* and the Highway Department must be found to have waived its Eleventh Amendment immunity.

The Highway Department, however, contends that the recent case of *State of California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) overruled the aforesaid, *Lauritzen* and *Parden* cases

by declaring, in essence, that section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C.A. § 403) does not provide for a private remedy. This interpretation of *Sierra* is incorrect.

The *Sierra* decision was not an admiralty case. It dealt with a very narrow section of the Rivers and Harbors Act of 1899 and merely held that under 33 U.S.C.A. § 403 (referred to in *Sierra* as section 10 of the Rivers and Harbors Act of 1899) a private party may not bring an action on behalf of those allegedly injured by statutory violations. The action now before this court for the death of Faust and injuries to Bennett and Muldrow is in no way based solely on 33 U.S.C.A. § 403 nor any other particular section of the Rivers and Harbors Act of 1899. This action is instead grounded on various other federal statutes and case law which creates liability in the United States of America and its agents as well as the State of South Carolina. It is also based upon the common law applicable to general maritime law regarding death and injury to persons on navigable waterways.

Moreover, the Highway Department's interpretation of *Sierra* is incorrect in that a reading of that case reveals that it only provides that section 10 does not create a private "right of enforcement remedy". *Sierra* in no way affects or alters the longstanding rule of a private remedy for "damages". Furthermore, *Sierra* does not in any way deal with nor touch upon the Eleventh Amendment. Therefore, the rulings regarding the Eleventh Amendment as contained in *Lauritzen* and *Parden* are still controlling in this circuit, and the Highway Department is subject to the jurisdiction of this court.

Thus, once the waiver has been effected by the state as in the present action, a plaintiff may use such statutory and common law available to him to set forth his cause of action against the state as he would against a private person or corporation. These statutory and common law remedies available in this action are set forth hereinafter.

2. *Theory of Liability*

(a) Meeting the test of jurisdiction, the issue then becomes whether the Highway Department is liable under any of the several theories of liability proposed by the plaintiffs. The primary theories espoused by the plaintiffs are as follows:

(1) That the Highway Department violated provisions enumerated under 33 U.S.C.A. § 401, *et seq.*, commonly referred to as the Rivers and Harbors Act of 1899, in that the Highway Department constructed, owned, operated and maintained a hazard to navigation by allowing and utilizing the cable operated ferry to exist in a hazardous manner in navigable waters.

(2) That the Highway Department violated the provisions of 14 U.S.C.A. § 81, *et seq.*, in that as the owner of the ferry they failed to comply with the provisions set forth in these statutes and failed to either properly mark or delineate the hazard that existed and failed to remove the same.

(3) That even if violations by the Highway Department of provisions set forth in 33 U.S.C.A. § 401, *et seq.* and 14 U.S.C.A. § 81, *et seq.* do not give rise to liability such liability exists under the general theory of maritime law regarding wrongful death in that these statutes establish a standard of care to be adhered to by the Highway Department and by a violation of these standards they subject themselves to liability as expounded in *Moragne v. United States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1969), and as a result are responsible for the damages sustained by the death of Faust and the injuries to Bennett and Muldrow.

(4) That pursuant to the "good Samaritan" theory of *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Highway Department is liable for the death of Faust and the injuries to Bennett and Muldrow.

(b) The preponderance of the evidence offered at the trial of these matters demonstrated that the injuries suffered by the plaintiffs were a direct and proximate result of the negligence and abuse of discre-

tion of the Highway Department by and through the acts and/or omissions of its agents, servants and/or its employees and, as a result, was actionable under one or more of the legal theories set forth by the plaintiffs.

■ The Highway Department by failing to remove the obstruction that it had constructed, owned and operated after it had full knowledge that it was a hazard and obstruction to navigation was a clear violation of the provisions embodied in 33 U.S.C.A. § 401, *et seq.* In addition, the actions and inactions of the Highway Department were a clear breach and violation of the standard of care imposed upon it by virtue of the provisions contained in 33 U.S.C.A. § 401, *et seq.*

■ The failure of the Highway Department to adequately mark and sign the ferry, its approaches, and the guide cable violated the affirmative duty placed upon the state as owner of the ferry to adequately mark the hazard as it existed or, in the alternative, to remove the hazard. The failure to accomplish either of these two matters was a violation of 14 U.S.C.A. § 81, *et seq.*, and the standard of care imposed thereby upon the Highway Department. This statute, among other requirements, provides the Coast Guard with the duty and responsibility of the marking of obstructions in the navigable waterways. The Coast Guard has in past cases been held liable for failing to mark and for improperly marking hazards, and it logically follows in this instance that the Highway Department as the creator of the hazard would also be liable pursuant to this statute and the applicable case law. *Thomson v. United States*, 266 F.2d 852 (4th Cir. 1959); *Doyle v. United States*, 441 F.Supp. 701 (D.S.C. 1977).

■ The Highway Department's failure to properly warn boaters approaching the ferry with effective signs and other devices, in light of its knowledge about the past accidents and the cable's propensity to cause such damage and injury, was a breach of the duty of care owed by the Highway

Department to the boating public and under general maritime tort law, it is responsible for its conduct. *Moragne v. United States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1969).

■ The ineffective attempts by the Highway Department to place warning signs on the ferry and its approaches were all inadequate, and violated the duty of care imposed upon the Highway Department under the "good Samaritan" theory as outlined in *Indian Towing Co., Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). This theory as expounded in *Indian Towing* provides that once the Highway Department attempts to warn boaters of the hazard it is required to proceed in a manner so as to assure that the warning was properly made. This the Highway Department failed to do. *See, Gaspar v. United States*, 460 F.Supp. 656 (D.C.Mass.1978); *Chute v. United States*, 449 F.Supp. 172 (D.C.Mass.1978). Specifically, the state violated the "good Samaritan" principle in three (3) ways:

(1) The Highway Department's ineffective attempts to mark the hazard and their pseudo warning devices actually increased the risk caused by the cable ferry.

(2) The Highway Department was duty-bound to maintain the crossing in a safe, non-hazardous manner.

(3) The injuries suffered by the plaintiffs resulted from the plaintiffs' justifiable reliance on the presumption that the Highway Department would maintain all of its operations and those areas under its control in a safe, non-hazardous manner.

B. *As to the United States of America*

1. *Jurisdiction and Sovereign Immunity of United States*

(a) This court has jurisdiction of this action under 28 U.S.C.A. § 1333. The actions instituted by the plaintiffs are appropriately brought under general maritime law. *See, Moragne v. United States*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1969) and

*Sea Land Services v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1973).

The United States is a proper defendant by virtue of 46 U.S.C.A. § 742, known as the Suits in Admiralty Act, whereby the United States may be sued in cases where, "if a private person were involved, a proceeding in admiralty could be maintained." *Jones Towing, Inc. v. United States,* 277 F.Supp. 839 (D.C.La.1967).

In addition, venue is properly laid according to 46 U.S.C.A. § 742.

■ (b) The Suits in Admiralty Act, 46 U.S.C.A. § 742, unlike the Federal Tort Claims Act, contains no discretionary function exception. *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975).

**2.** *Liability of The Coast Guard*

■ (a) The Coast Guard, pursuant to 14 U.S.C.A. § 86, is charged with the duty and responsibility to mark "any sunken vessel or other obstruction existing on the navigable waters . . . of the United States." This section, prior to being amended in 1965, made reference only to the marking of "any sunken vessel and other *similar* obstruction existing on any navigable waters." 14 U.S.C.A. § 86, *as amended,* 14 U.S.C.A. § 86 (Supp.1980). (Emphasis added). The legislative history pertaining to this amendment is found in Senate Report No. 688 and states, "This bill . . . provides that the primary obligation for marking *all* obstructions to navigation rests with the Coast Guard." 1965 U.S.Code Cong. and Ad.News 3140 (Emphasis added) By way of this amendment, Congress broadened the application of 14 U.S.C.A. § 86 to include not only submerged obstructions, but surface obstructions as well.

■ (b) The decision of *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975) provides that the Coast Guard has some discretion in deciding whether or not to mark an obstruction and in this regard it must exercise its discretion responsibly. In the instant case, the Coast Guard failed to mark the cable, knowing full well that it constituted a serious danger and a real hazard to navi-

gation. Thus, the failure of the Coast Guard to mark this cable was not a responsible exercise of their discretion, and their conduct was not reasonable under the existing circumstances.

■ (c) In addition to, and outside of the obligation imposed by 14 U.S.C.A. § 86, the Coast Guard had an additional responsibility pursuant to 14 U.S.C.A. § 81 which provides in part that "[i]n order to aid navigation and to prevent disasters, collisions, and wrecks of vessels . . ., the Coast Guard may establish, maintain and operate: (1) Aids to maritime navigation required to serve the needs . . . of the Commerce of the United States." *Id.* Along these same lines, the Coast Guard is charged under 33 C.F.R. § 66.01–1—10 (1976) with regulating private or state aids to navigation. Thus, it is the Coast Guard's duty to see that safe non-hazardous aids to navigation are correctly maintained by the states.

■ Although the Coast Guard recognized their obligation as early as October 9, 1974, to require the Highway Department to adequately warn the boating public of the guide cable's danger, they failed to provide sufficient direction to the Highway Department concerning warnings to be placed on the cable itself. Pursuant to their authority under 14 U.S.C.A. § 81, the Coast Guard directed the Highway Department to install signs at certain locations with certain specifications dealing with color, size, and lighting of the signs which would warn approaching boaters of a "ferry crossing", but they made no effort to guard the public from the hazardous guide cable stretching across the waterway. In addition, the Coast Guard never followed through on its directives to determine if they had been completed and carried out by the Highway Department.

It has been held that if the United States is aware of a hidden danger and undertakes to mark it, it is subject to liability if the marking constitutes "a trap for the ignorant or unwary, rather than a warning of the danger." *Somerset Seafood Co. v. United States,* 193 F.2d 631, 635 (4th Cir.

1951). As provided in *Indian Towing Company, Inc. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), it is well recognized that "one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." Although *Indian Towing* involved a claim arising under the Federal Tort Claims Act, this "good Samaritan" principle has been subsequently applied in admiralty cases. *See, e.g., Frank v. United States*, 250 F.2d 178 (3d Cir. 1961); *United States v. Gavagan*, 280 F.2d 319 (5th Cir. 1960). Moreover, a 1960 amendment to the Suits in Admiralty Act would incorporate that concept since an *Indian Towing* type case would now be brought under 46 U.S.C.A. § 742 (commonly known as the Suits in Admiralty Act).

The Coast Guard in relation to its involvement with the South Island Ferry crossing completely ignored its duties and responsibilities as embodied in 33 C.F.R. § 66.01–1, *et seq.* At no time did the Coast Guard require the Highway Department to comply with the applicable regulations regarding private aids to navigation, and it is liable for its conduct.

### (d) *Duty To Warn*

■ (1) The duty of the Coast Guard to warn mariners of hidden dangers to navigation where the same are known to the Coast Guard is well established. *Chapman v. United States*, 541 F.2d 641 (7th Cir. 1976); *Dye v. United States*, 210 F.2d 123 (6th Cir. 1954); and *Beeler v. United States*, 256 F.Supp. 771 (D.C.Pa.1966). This imposed duty arises from their knowledge of the hidden danger, their authority to implement correction, and their statutory responsibility to the public. This duty arises independently of the ownership, construction, maintenance, or operation of the dangerous obstruction. In the instant case, the Coast Guard knew of the dangers posed by the guide cable, yet it failed to provide or require adequate markings at the crossing.

### 3. *Liability of the Corps of Engineers*

■ (a) Liability of the Corps rests in part under the language of 33 U.S.C.A. § 401, *et seq.* (Rivers and Harbors Act of 1899). Although these sections do not explicitly create a private enforcement mechanism, a private right of action can be implied on behalf of those injured by a violation of these sections. *See, Lauritzen v. Chesapeake Bay Bridge and Tunnel District*, 404 F.2d 1001 (4th Cir. 1968). The long-established right of action to recover damages resulting from a violation of laws pertaining to obstruction of navigable waters has long been recognized by the Fourth Circuit. *Id.*

As early as 1927, the Supreme Court held a private person had the right to sue the United States for damages arising out of "failure to comply with its own navigation laws." *Eastern Transp. Co. v. United States*, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed.2d 472 (1927). This reasoning has been followed in a long line of cases. *See, e.g., McCormick v. United States*, 645 F.2d 299 (5th Cir. 1981); *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975); *Buffalo Bayou Transp. Co. v. United States*, 375 F.2d 675 (5th Cir. 1967); *Somerset Seafood Co. v. United States*, 193 F.2d 631 (4th Cir. 1951); *Doyle v. United States*, 441 F.Supp. 701 (D.S.C.1977); *Jones Towing Co. v. United States*, 277 F.Supp. 839 (D.C.La.1967).

■ (b) The Corps was negligent in failing to require the Highway Department to remove the cable which constituted a hazard and obstruction to navigation. The Corps had first hand knowledge of the ferry itself and the dangerous and hazardous condition that it caused to boaters using the waterway. This is evident by the fact that at least one previous suit had been filed against the Corps involving the South Island Ferry as well as the fact that there were numerous letters from the Corps addressing the problem caused by the ferry crossing. The Corps's failure to move against the State of South Carolina to require a closing of the ferry site until the cable could be removed, is evidence of the Corps's lack of due care. To allow such an

obstruction to continue as they did was negligence, and it was not a responsible exercise of their discretion.

■ (c) Under the language of *Moragne*, the Corps is liable. That decision provided that "Where death is caused by a breach of duty imposed by federal maritime law, Congress has established a policy favoring recovery in the absence of a legislation direction to except a particular class of cases." The breach of duty by the Corps subjects them to general maritime law and liability under the provisions of *Moragne*.

■ (d) The Corps as a result of its undertaking also falls under the language of *Indian Towing Co., Inc.* and subjects itself to the "good Samaritan" principle. It is evident that the undertaking in this instance by the Corps was not done in a careful and non-negligent manner.

### C. *Miscellaneous*

■ Under South Carolina law, S.C. Code Ann. § 50–21–110(2) (1976), it is unlawful for a person who is under the influence of alcohol to use a motorboat, boat or vessel. This statute, unlike section 56–5–2950 of the 1976 Code of Laws of South Carolina (commonly referred to as the Implied Consent Law), applies only to boaters and sets forth no standards such as those found in the "Implied Consent Law" dealing with the operation of motor vehicles on the roads in the State of South Carolina. Accordingly, the presumptions found under the provisions of section 56–5–2950 would have no applicability to the matters pertaining to the operation of boats, motorboats or vessels in determining whether or not the operator was under the influence of alcohol. This being the case, the determination of intoxication must be based on testimony relating to a person's mannerisms and characteristics that would lead one to conclude that he was under the influence of alcohol or it must be based on expert testimony relating to such matters.

The court has received and reviewed in this matter a report dealing with the blood alcohol content of the deceased but finds it inconsequential in this action inasmuch as the report standing alone without testimony either from lay persons as to matters that would lead one to believe that the deceased was under the influence or from an expert as to what might be expected of a person with a blood alcohol reading equivalent to that reflected on the report is of little value to the court.

■ A number of questions arose during the trial of this case as to the admissibility of certain evidence and testimony as to matters occurring at the South Island site subsequent to December 11, 1977. Timely objections were made by the attorneys representing the defendants as to the introduction of this evidence. After reviewing the evidence, I find that the only evidence as to changes subsequent to December 11, 1977, that would be admissible in this matter would be those changes relating to the acquisition and installation of the self-propelled motorized ferry and the addition of the warning boats equipped with public address systems placed at the ferry site on December 12, 1977. Both of these matters are admissible under the provisions and scope of Rule 407 of the Federal Rules of Evidence.

### D. *Allocation of Damages*

■ As to the respective liability of the defendants, the rule in admiralty is, where more than one party is responsible for the accident, that the liability is to be allocated among the parties proportionate to the comparative degree of their fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 291 (1975). This rule has also been followed in the decision of *Miller Industries, Inc. v. Caterpillar Tractor Co.*, 473 F.Supp. 1147 (S.D.Ala.1979), where the court found that it may apportion the liability to the negligent defendants in accordance with their comparative degree of fault.

### E. *Damages*

■ An action lies under general maritime law for death caused by a violation or violations of maritime duties. The *Mo-*

*ragne* decision allows a widow to assert a claim for the wrongful death of her husband. In determining the elements of damage and the amount of damage, it is necessary for the court to follow the guidelines set forth in *Gaudet.*

■ Under the language of *Gaudet*, it is recognized that there exists a right for the recovery of loss of support which includes all financial contributions the decedent would have made to his dependents had he lived. This includes monies that he would earn from his livelihood as well as the monetary value of services that the decedent would have provided had he continued to live. These two elements include compensation both for net earnings and services provided prior to trial and for such services and monies that would have been provided during the work-life expectancy of the decedent.

In addition, *Gaudet* recognizes that services also include the nurture, training, education and guidance that a child would have received had his parent not been wrongfully killed. This is in addition to compensation for services that the decedent would have performed at home for his family and spouse.

Although *Gaudet* does not recognize mental anguish or grief, it establishes a clear right of the beneficiary to recover for a loss of "society." The term "society," in accordance with the language of *Gaudet* embraces a number of mutual benefits that each family member would have received from the other's continued existence. These benefits include but are not limited to love, affection, care, attention, companionship, comfort and protection. It also includes loss of consortium as well as damages for funeral expenses that are incurred by the survivors.

*Gaudet*, although it set forth a number of guidelines to be used by the court, in no way limits the court's consideration of other elements outside of those set forth in *Gau-*

*det.* Instead the decision recognized that in damages for tortuous injury, the court need not be insistent on mathematical precision and the language of *Gaudet* leaves to the judge or juror fair latitude to make reasonable approximations guided by judgment and practical experience.

■ The elements of damage which can properly be considered in determining the amount of personal injury to a plaintiff includes loss of earning power, pain and suffering, medical expenses and any future damage resulting from permanent injuries. *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 136 S.E.2d 286, 291 (1964); *Oliver v. Blakeney*, 244 S.C. 565, 137 S.E.2d 772, 776 (1964).

Based on the foregoing findings of fact and conclusions of law, it is

ORDERED, that judgment be entered in favor of the plaintiff, Alean Hester Faust, Administratrix of the Estate of Charles Lonnie Faust, deceased, against the defendants, South Carolina State Highway Department and the United States of America, jointly and severally, in the sum of Four Hundred Ninety-Nine Thousand Sixty Nine and NO/100 ($499,069.00) Dollars. It is

ORDERED FURTHER, that judgment be entered in favor of the plaintiff, Curtis L. Muldrow, against the defendants, South Carolina State Highway Department and United States of America, jointly and severally, in the sum of Eighteen Thousand and NO/100 ($18,000.00) Dollars. It is

ORDERED FURTHER, that judgment be entered in favor of the plaintiff, Tommy Bennett, against the defendants, South Carolina State Highway Department and United States of America, jointly and severally, in the sum of Five Thousand and NO/100 ($5,000.00) Dollars. It is

ORDERED FURTHER, that interest[3] on the above judgments as to the United

---

**3.** The allowance *vel non* of prejudgment interest in admiralty actions is a matter within the sound discretion of the trial court. *Reiss Steamship Co. v. United States Steel Corp.*, 427 F.2d 1152, 1153 (6th Cir. 1970); *Rosa v. Insurance Company of State of Pennsylvania*, 421

F.2d 390, 393 (9th Cir. 1970); *Circle Line Sightseeing Yachts v. Storbeck*, 325 F.2d 338 (2d Cir. 1963); *Gardner v. National Bulk Carriers, Inc.*, 221 F.Supp. 243, aff'd, 333 F.2d 676 (4th Cir. 1964).

States of America shall run at the rate of Four (4%) per cent per annum from the date of the filing of these lawsuits on May 15, 1978; the interest on the above judgments as to the South Carolina State Highway Department shall run at the rate of Six (6%) per cent per annum from the date of the filing of these lawsuits on May 15, 1978, through July 4, 1979, and thereafter at the rate of Eight and Three-Fourths (8¾%) per cent per annum. It is

ORDERED FURTHER, that inasmuch as I have determined that the two defendants are equally liable and found the deceased not to have been contributorily negligent, that the crossclaims of the defendants against each other or contributions and their counterclaims against the estate of the owner and operator of the boat, Charles Lonnie Faust, be, and the same are hereby dismissed with prejudice.

AND IT IS SO ORDERED.